# EXHIBIT "1"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 21-XXXXX-CIV

THE GOVERNMENT OF THE COOK
ISLANDS,

                    Petitioner,

        v.

DWANE L. HUBBART,

                    Respondent.

_____/

**DECLARATION OF ANDREAS A. FRISCHKNECHT IN SUPPORT OF PETITION TO
RECOGNIZE AND ENFORCE FOREIGN ARBITRAL AWARD**

ANDREAS A. FRISCHKNECHT, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a lawyer and partner in the law firm of Chaffetz Lindsey LLP.  I am admitted
to practice law in the State of New York.

2.      I submit this Declaration in support of the Petition to Confirm and Enforce Foreign
Arbitral Award of Petitioner The Government of the Cook Islands (the "Cook Islands").  I am
familiar with the facts stated herein.

3.      I acted as counsel for the Cook Islands in the arbitration captioned *Dwane L.
Hubbart vs. The Government of the Cook Islands* and conducted in London, United Kingdom,
under the 2017 Rules of Arbitration of the International Chamber of Commerce (the
"Arbitration").  I also acted as counsel for the Cook Islands in preceding federal court litigation in
the District of Columbia captioned *Dwane L. Hubbart v. Government of the Cook Islands,* Civ.
No. 1:11-cv-02130(EGS) (D.D.C.) (the "D.C. Litigation").

1

4.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of a settlement agreement between the parties dated May 3, 2013 (the "Settlement Agreement") that resolved the D.C. Litigation.   Paragraph 13 of the Settlement Agreement sets forth the parties' agreement to resolve "[a]ny dispute, controversy, or claim arising out of, relating to, or in connection with this Settlement Agreement" through "binding arbitration under the Rules of Arbitration of the International Chamber of Commerce."

5.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the arbitral tribunal's Partial Award on Liability in the Arbitration dated April 4, 2019.

6.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the arbitral tribunal's Partial Award on Causation in the Arbitration dated February 18, 2020.

7.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the arbitral tribunal's Final Award on Costs in the Arbitration dated July 1, 2020.   The Final Award on Costs directed Dwane L. Hubbart, the Respondent in this proceeding, to pay the Cook Islands (a) "USD 237,500 as reimbursement of the [Cook Islands'] share of the ICC's Administrative Costs and the Tribunal's Fees and Expenses"; plus (b) "USD 980,205.23 in respect of the [Cook Islands'] legal costs and other costs incurred in this arbitration"; and (c) simple interest on the foregoing principal amounts "at the rate of 8% per annum from the date of this [Final] Award [on Costs] until the date of actual payment."

8.      To date, the Final Award on Costs remains wholly unsatisfied.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 12, 2021.

Andreas A. Frischknecht

2

# EXHIBIT "A"

Execution Copy

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into effective as of May 3, 2013 (the "Effective Date") between Dwane L. Hubbart ("Hubbart"), whose address is 20533 Biscayne Blvd. # 1315, Aventura, FL 33180, on the one hand and the Government of the Cook Islands and Ministry of Health of the Cook Islands (collectively, the "Cook Islands Government Parties") on the other hand.  Hubbart and the Cook Islands Government Parties are sometimes hereinafter collectively referred to as the "Parties."

**WHEREAS,** on or about November 30, 2011, Hubbart commenced an action against the Cook Islands Government Parties in the United States District Court for the District of Columbia, styled as Dwane L. Hubbart v. The Government of the Cook Islands and The Ministry of Health of the Cook Islands, Case No. 1:11-cv-02130-EGS (the "Action"), asserting claims for breach of contract, expropriation of contract rights, and declaratory judgment (the "Claims");

**WHEREAS**, counsel for the Parties have engaged in settlement discussions which have resulted in the Parties agreeing to settle all claims and counterclaims that were brought or could have been brought in the Action between or among the Parties, without any admission of liability or wrongdoing, on the terms and conditions set forth in this Settlement Agreement;

**NOW, THEREFORE,** in consideration of the above premises and for good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereby agree and covenant as follows:

1.     **Letters from Cook Islands Secretary of Health and Business Trade Investment Board.**   Upon execution and exchange of this Settlement Agreement by all Parties, the Cook Islands Government Parties shall furnish to Hubbart's counsel: (i) two original letters on the letterhead of the Ministry of Health of the Cook Islands and signed by the Secretary of Health of the Cook Islands, in the form attached hereto as Exhibit A; and (ii) a letter on the

1

R-1-001

letterhead of the Business Trade Investment Board of the Cook Islands ("BTIB") and signed by the Chief Executive Officer of the BTIB, in the form attached hereto as Exhibit B. Upon execution and exchange of this Settlement Agreement by all Parties, the Cook Islands Government Parties additionally shall transmit by Federal Express or comparable international courier service seven further original copies of the letter attached hereto as Exhibit A to the following designated entities for coursework evaluation and examination purposes:

a.  Josef Silny & Associates, Inc.
International Education Consultants
7101 S.W. 102 Avenue
Miami, FL 33173
U.S.A.
Telephone: +1 305 273 1616

b.  World Education Services
64 Beaver Street, # 146
New York, NY 10004
U.S.A.
Telephone: +1 212 966 6311

c.  Educational Commission for Foreign Medical Graduates
3624 Market Street
Philadelphia, PA 19104
U.S.A.
Telephone: +1 215 386 5900

d.  Commission on Graduates of Foreign Nursing Schools
3600 Market Street, Suite 400
Philadelphia, PA 19104-2651
U.S.A
Telephone: +1 215 222 8454

e.  Texas Higher Education Coordinating Board
Academic Affairs and Research
1200 East Anderson Lane
Austin, Texas 78752
U.S.A
Telephone: 512-427-6200

f.  Maine DOE
23 State House Station

2

R-1-002

Augusta, ME 04333
U.S.A.
Telephone: 207- 624-6600

g.    Oregon Student Access Commission
      Office of Degree Authorization
      1500 Valley River Drive, Suite 100
      Eugene, OR 97401
      U.S.A.
      Telephone: 541-687-7400

2.    **Discontinuance of the Action and Dispatch of Letters.** Upon execution and
exchange of this Settlement Agreement by all Parties, the Cook Islands Government Parties and
their counsel shall execute and provide to Hubbart's counsel a Joint Stipulation of Dismissal with
prejudice in the form attached hereto as Exhibit C. The Joint Stipulation of Dismissal shall be
executed and filed electronically with the Court by Hubbart's counsel immediately upon his
receipt of emails attaching (i) PDF copies of two original letters in the form attached hereto as
Exhibit A and a PDF copy of the letter in the form attached hereto as Exhibit B (with shipment
tracking information confirming that the originals having been sent by Federal Express or
comparable international courier service) to Hubbart; and (ii) shipment tracking information
confirming that further original copies of the letter in the form attached hereto as Exhibit A have
been sent by Federal Express or comparable international courier service to the seven designated
entities identified in subparagraphs (a) through (g) of paragraph 1 above.

3.    **New Application to Operate a Medical School.**  Upon the filing of the Joint
Stipulation of Dismissal pursuant to paragraph 2 of this Settlement Agreement, the Cook Islands
Government Parties agree and acknowledge that Hubbart shall be free to apply to the competent
Cook Islands authorities for any and all necessary approvals, licenses, permissions and/or
authorizations to operate a medical school under the name of St. Mary's School of Medicine in

the Cook Islands. The Cook Islands Government Parties further agree and acknowledge that any events preceding the date of this Settlement Agreement, including without limitation the events at issue in the Action and the fact that Hubbart commenced the Action, shall not constitute grounds to deny any such application; provided, however, that the competent Cook Islands authorities shall retain full discretion and authority to deny or impose appropriate conditions on any such application if and to the extent that it is not in compliance with all applicable provisions of law in effect at the time such application is made. The Cook Islands will inform Hubbart clearly and distinctly of what is needed to obtain approvals in the event an application is denied and how to cure any deficiencies in order to obtain the required approvals. The Cook Islands Government will not oppose any application for approvals on the basis of the historical relationship between the Plaintiff and the Cook Islands Government and will undertake to ensure that any applications are dealt with expeditiously and without bias, and that such applications will be considered in good faith without imposing any unfair, extreme or unusual impediments.

4.    **New Medical School Agreement.**  No new agreement for the St. Mary' School of Medicine to operate in the Cook Islands has been developed, negotiated and/or approved by the Cook Islands Cabinet as of this time. The Parties agree to negotiate in good faith in order to achieve a new medical school Agreement and Charter for the establishment of the St. Mary's School of Medicine, including approval and ratification of the same by the Cook Islands Cabinet, within twelve (12) months of the Action being dismissed. Cook Islands law will govern the new medical school Agreement. As set out in Exhibit B, St. Mary's School of Medicine's BTIB registration will remain in effect for a period of not less than one year from the date of execution of this Settlement Agreement and, if good faith negotiations by Hubbart are ongoing beyond that

4

Execution Copy

time, St. Mary's School of Medicine can seek and will be granted further extensions of the registration.

5.     **Responding to information requests regarding St. Mary's School of Medicine.**     The Cook Islands Government Parties agree to respond in a timely and expeditious manner to any and all requests by third parties regarding St. Mary's School of Medicine and will contact and notify Hubbart prior to responding to any of these requests. The Cook Islands agrees not to provide any incorrect information regarding St. Mary's School of Medicine. The current contact information for Hubbart is: (a) email: drdwanehubbart@aol.com and smmedprog@aol.com  (b) Address: 20533 Biscayne Blvd PMB# 1315, Aventura, FL 33180. If the contact information for Hubbart changes, Hubbart will notify the Crown Law Office of any changes.

6.     **Release by Hubbart.**     Hubbart, individually, jointly and on behalf of his respective agents, lenders, partners, attorneys, beneficiaries, successors, and assigns, as well as on behalf of the Saint Mary's School of Medicine, does hereby release and forever discharge the Cook Islands Government Parties and each of their respective present and former agents, employees, attorneys, contractors, officers, predecessors, successors, and assigns from all obligations under the alleged contracts that were disputed in the Action, as well as releases and discharges any other debts, obligations, promises, covenants, agreements, contracts, controversies, suits, actions, causes of actions, trespasses, violations of law, judgments, damages, claims or demands, causes or things whatsoever, whether known or unknown, whether in law or equity, which Hubbart had, may have now or in the future against the Cook Islands Government Parties by reason of any causes, matters or things whatsoever from the beginning of the world to the Effective Date of this Settlement Agreement specifically including but not limited to any

5

Execution Copy

claims, matters or causes of action, claims or counterclaims that were asserted or that could have been asserted by Hubbart in the Action which release shall specifically also include any claims or causes of actions that Hubbart may claim to have based on theories of malicious prosecution, tortious interference, abuse of process, or vexatious litigation (the "Released Claims");  provided however, that the Released Claims shall not include any rights, claims, causes of action, or covenants contained in, created by, expressly preserved in, or arising out of this Settlement Agreement.

The releases set forth herein shall be, and remain in effect as, full and complete releases, notwithstanding the discovery or existence of any additional or different facts not previously known or understood after the execution and exchange of this Settlement Agreement.  THE PARTIES HEREBY WAIVE EACH AND EVERY STATUTORY, EQUITABLE, AND COMMON LAW PROHIBITION AND LIMITATION ON THE RELEASE OF UNKNOWN CLAIMS AND ACKNOWLEDGE THAT THE FOREGOING WAIVER IS GIVEN KNOWINGLY AND WITH THE ADVICE OF COUNSEL.

7.     Release by the Cook Islands Government Parties.     The Cook Islands Government Parties individually, jointly and on behalf of their respective agents, lenders, partners, attorneys, beneficiaries, successors, and assigns, do hereby release and forever discharge Hubbart and each of his present and former partners, associates, agents, employees, attorneys, contractors, predecessors, successors, and assigns from all obligations under the alleged contracts that were disputed in the Action, as well as release and discharge any other debts, obligations, promises, covenants, agreements, contracts, controversies, suits, actions, causes of actions, trespasses, violations of law, judgments, damages, claims or demands, causes or things whatsoever, whether known or unknown, whether in law or equity, which the Cook

6

R-1-006

Islands Government Parties had, may have now or in the future against Hubbart by reason of any causes, matters or things whatsoever from the beginning of the world to the Effective Date of this Settlement Agreement specifically including but not limited to any claims, matters or causes of action, claims or counterclaims that were asserted or that could have been asserted by the Cook Islands Government Parties in the Action, which release shall specifically also include any claims or causes of actions that the Cook Islands Government Parties may claim to have based on theories of malicious prosecution, tortious interference, abuse of process, or vexatious litigation (the "Released Claims");  provided however, that the Released Claims shall not include any rights, claims, causes of action, or covenants contained in, created by, expressly preserved in, or arising out of this Settlement Agreement.

The releases set forth herein shall be, and remain in effect as, full and complete releases, notwithstanding the discovery or existence of any additional or different facts not previously known or understood after the execution and exchange of this Settlement Agreement.  THE PARTIES HEREBY WAIVE EACH AND EVERY STATUTORY, EQUITABLE, AND COMMON LAW PROHIBITION AND LIMITATION ON THE RELEASE OF UNKNOWN CLAIMS AND ACKNOWLEDGE THAT THE FOREGOING WAIVER IS GIVEN KNOWINGLY AND WITH THE ADVICE OF COUNSEL.

8.  **Confidentiality.**   The Parties represent and agree that they will not discuss or disclose (or cause or authorize to be disclosed) the terms of this Settlement Agreement with any third parties without the prior written consent of Hubbart (in the case of the Cook Islands Government Parties) or the prior written consent of the Cook Islands Government Parties (in the case of Hubbart).

Notwithstanding the foregoing, any party may disclose the existence and/or terms of this Settlement Agreement: (1) to the Parties' legal counsel, provided that the party first inform such legal counsel of the confidentiality provisions of this Settlement Agreement; (2) to regulatory authorities to the extent that such disclosure is required by any competent court, law, rule, governmental agency, administrative or legal order; (3) in response to a valid subpoena, or as otherwise required by law; or (4) in a proceeding to enforce its terms.

9.      **Non-Admission of Liability.**    This Settlement Agreement shall not be, nor be considered, an admission of any liability by any party or as an adoption, assertion, or waiver of any particular position.

10.     **Representations and Warranties.**    The Parties represent and warrant that they are the owners of the Released Claims, that none of them has assigned or transferred to any person or entity any portion of any claim that is released, remised, waived, acquitted and discharged by the Parties pursuant to this paragraph and this Settlement Agreement.  The Parties further represent and warrant to each other that each signatory has all organizational power and authority necessary to execute, deliver and perform this Settlement Agreement and to consummate the settlement transactions contemplated hereby and thereby, and has taken all organizational action necessary to authorize the execution, delivery and performance of this Settlement Agreement and the consummation of the settlement transaction contemplated hereby and thereby.

11.     **Independent Representation.**    Each party hereto acknowledges and agrees that it has received independent legal counsel of its own choice and that it has been sufficiently apprised of and understands its respective rights and responsibilities with regard to the substance of this Settlement Agreement.  The Parties hereto acknowledge and represent that they have

Execution Copy

carefully read this Settlement Agreement and any attachments and understand and freely consent to their terms after having had a full and complete opportunity to review with their counsel.

12.   **Choice of Law.**   This Settlement Agreement and all actions or proceedings arising directly or indirectly from this Settlement Agreement, shall be governed by Cook Islands law (without regard to conflict of law principles).

13.   **Arbitration and Waiver of Sovereign Immunity.**

Any dispute, controversy, or claim arising out of, relating to, or in connection with this Settlement Agreement, including with respect to the formation, applicability, breach, termination, validity or enforceability thereof, shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("Arbitration"). The tribunal shall consist of three arbitrators, one arbitrator appointed by each Party and the third, who shall be the President of the tribunal, appointed by the Court of Arbitration of the International Chamber of Commerce. The seat of Arbitration shall be London, England, and the proceedings shall be conducted in English.

The Arbitration shall be final and binding on the Parties. The Parties undertake to carry out any award rendered in the Arbitration without delay. The Parties explicitly waive any right to refer any question of law and any right of appeal on the law and/or merits to any court.

For the avoidance of doubt, and without regard to any provisions of Cook Islands law and without regard to paragraph 12 above, the Cook Islands Government Parties hereby irrevocably waive any claim to sovereign or any other immunity in regard to (i) participation in the Arbitration and (ii) proceedings before any competent court to enforce (a) the Arbitration agreement contained herein or (b) any Arbitration award rendered by a tribunal constituted pursuant to this Settlement Agreement.

**14.** **Covenant Not to Sue.** The Parties hereby covenant not to sue each other or their agents, representatives, successors, assigns, or employees with respect to any of the Released Claims. In the event of any subsequent litigation, if any, concerning any of the Released Claims or the subject matter of the Action, or between the Parties to enforce this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and litigation costs with respect to any such subsequent litigation.

**15.** **Authorized Signatures.** Each party represents and warrants that its signatory whose signature appears below has been and is on the date of this Settlement Agreement duly authorized to execute this Settlement Agreement and to make the representations and agreements herein.

**16.** **Multiple Originals.** This Settlement Agreement may be executed in duplicate original counterparts, each of which shall be considered an original for all purposes. A signature received by a party by facsimile (or email attachment) is binding upon all Parties as an original. All Parties agree that a photocopy of any such facsimile (or email attachment) may be treated as a duplicate original.

**17.** **Entire Agreement.** Except as otherwise provided for herein, this Settlement Agreement and exhibits contain the entire understanding of the Parties with respect to its subject matter, is intended to be a full and complete integration of the Parties' agreement with respect to settlement of the Action, and supersedes any prior discussions, negotiations, representations, or understandings between the Parties related to its subject matter that are not fully expressed herein. This Settlement Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors, assigns, executors and administrators.

Execution Copy

18.    Modification.    Any amendment, waiver or modification to this Settlement Agreement must be in writing, must specifically refer to this Settlement Agreement, and must be signed by a duly authorized representative of each of the Parties to such amendment or modification.

DATED:    May 3, 2013

PLAINTIFF
DWANE L. HUBBART

By: _____
Paul Gaston
LAW OFFICES OF PAUL G. GASTON
1901 Pennsylvania Avenue, NW
Suite 607
Washington, DC 20006
Tel: (202) 296-5856
Email: pgaston@attglobal.net

DEFENDANTS
THE GOVERNMENT OF THE COOK
ISLANDS AND THE MINISTRY OF
HEALTH OF THE COOK ISLANDS

By: _____
James Hosking
CHAFFETZ LINDSEY LLP
505 Fifth Avenue
4th Floor
New York, NY 10017
Tel:  (212) 257-6964
Email: James.Hosking@chaffetzlindsey.com

Agreed and Accepted:        DWANE L. HUBBART

By: _____
Dwane L. Hubbart

11

R-1-011

Execution Copy

Agreed and Accepted:          THE GOVERNMENT OF THE COOK ISLANDS

By: _____

Henry Puna, Attorney General

Agreed and Accepted:          THE MINISTRY OF HEALTH OF THE COOK ISLANDS

By: _____

Nandie Glassie, Minister of Health

12

R-1-012

Execution Copy

## EXHIBIT A – FORM OF LETTER FROM
## SECRETARY OF HEALTH OF THE COOK ISLANDS

13

R-1-013

Execution Copy

[Ministry of Health Letterhead]

[Date], 2013

Re:     St. Mary's School of Medicine

To Whom It May Concern:

I have been asked by the St. Mary's School of Medicine to issue this letter to confirm the status of the St. Mary's School of Medicine and its programs taught.

The St. Mary's School of Medicine on April 28, 1998 first received approval in principle (subject only to clearances) from the Cabinet of the Cook Islands (which is a Cabinet of Ministers comprising in part the Prime Minister, the Minister of Health, the Minister of Education and is the executive decision making body for the Cook Islands Government) to operate as an educational institution of higher learning.  Thereafter, the St. Mary's School of Medicine commenced operations offering: (A) a 3 year 4 months Doctor of Medicine Degree program for those students who already have a Bachelors Degree or have already completed a minimum of 90 semester credit hours of undergraduate coursework including the completion of the required pre-medical sciences at an accredited institution; and (B) up to a 2 year nursing program for those students who have already completed at least an Associates Degree or 2 years of undergraduate coursework including the completion of the required pre- nursing sciences at an accredited institution.

The Cabinet of the Cook Islands allocated the authority of coordination for the establishment of the St. Mary's School of Medicine to the then Secretary of Health.  The requirements were formed for the accreditation of the programs taught by the St. Mary's School of Medicine.  The St. Mary's School of Medicine programs taught were then granted accreditation, approval, and recognition in the Cook Islands by the then Secretary of Health. The graduates of the St. Mary's School of Medicine are eligible to practice Medicine and Nursing in the Cook Islands subject to the requirements of the Cook Islands Medical Council and the Cook Islands Nursing Council.

The St. Mary's School of Medicine was listed in the World Health Organization Directory of Medical Schools 7th Edition publication at the request of the Cook Islands Ministry of Health.

The St. Mary's School of Medicine accreditation, approval, and recognition granted by the then Secretary of Health served as the accreditation, approval and recognition for the programs taught by the St. Mary's School of Medicine in the Cook Islands. It is my understanding that St. Mary's School of Medicine anticipates resuming new classes in 2014 and the St. Mary's School of Medicine will further make the necessary applications pursuant to the Education Act 2012.

If you have any concerns or questions requiring my attention please do contact me.

14

Execution Copy

Sincerely,

*[Name of Secretary of Health]*
Secretary of Health
Ministry of Health
P.O. Box 109
Avarua, Rarotonga
Cook Islands

15

Execution Copy

## EXHIBIT B – FORM OF LETTER FROM BUSINESS TRADE INVESTMENT BOARD OF THE COOK ISLANDS

R-1-016

Execution Copy

[Business Trade Investment Board Letterhead]

[Date], 2013

Dwane L. Hubbart
20533 Biscayne Blvd. # 1315
Aventura, FL 33180
United States of America

Re:    Foreign Enterprise Registration Certificate for the St. Mary's School of Medicine

Dear Mr. Hubbart:

This letter will serve to confirm that the Foreign Enterprise Registration Certificate for the St. Mary's School of Medicine will remain in effect for a period of not less than one year from the date of this letter.

Please contact the undersigned should you have any questions concerning this letter.

Sincerely,

[Chief Executive Officer of the BTIB]

17

R-1-017

Execution Copy

## EXHIBIT C – FORM OF NOTICE OF DISMISSAL

R-1-018

Execution Copy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DWANE L. HUBBART,

                Plaintiff,

      V.

GOVERNMENT OF THE COOK ISLANDS et al.,

           Defendants.

Civ. No. 1:11-cv-02130(EGS)

## JOINT STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), Plaintiff, Dwane L. Hubbart, and Defendants,

The Government of the Cook Islands and the Ministry of Health of the Cook Islands, hereby

stipulate to the dismissal, **with prejudice**, of all claims asserted in this action. Each party shall

bear its own costs and attorney fees in connection with this action.

Dated: [Date], 2013

Respectfully Submitted,

Paul G. Gaston (DC Bar # 290833)
**LAW OFFICES OF PAUL G. GASTON**
1901 Pennsylvania Avenue, NW
Suite 607
Washington, DC 20006
(202) 296-5856
pgaston@attglobal.net

*Attorney for Plaintiff*

James Hosking
(j.hosking@chaffetzlindsey.com)
Andreas A. Frischknecht
(a.frischknecht@chaffetzlindsey.com)
Jeremy M. Neil
(j.neil@chaffetzlindsey.com)

**CHAFFETZ LINDSEY LLP**
505 Fifth Avenue, 4th Floor
New York, NY 10017
Tel. (212) 257-6960

19

R-1-019

Execution Copy

Fax (212) 257-6950

– and –

_____

Justin V. Shur
(jshur@mololamken.com)
(DC Bar # 973855)

**MOLO LAMKEN LLP**
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Tel. (202) 556-2000
Fax (202) 556-2001

*Attorneys for Defendants the
Government of the Cook Islands and
the Ministry of Health of the Cook
Islands*

20

# EXHIBIT "B"

**IN THE MATTER OF AN ARBITRATION UNDER THE**

**2017 RULES OF ARBITRATION OF**

**THE INTERNATIONAL CHAMBER OF COMMERCE ("ICC")**

**INTERNATIONAL COURT OF ARBITRATION**

ICC ARBITRATION NO. 23261/TO

BETWEEN

**DWANE L. HUBBART**

("Claimant")

**v.**

**THE GOVERNMENT OF THE COOK ISLANDS**

("Respondent")

---

## PARTIAL AWARD ON LIABILITY

---

BEFORE

**Mr William Wood QC** – Arbitrator
**Mr Murray Rosen QC** – Arbitrator
**Ms Juliet Blanch** – Presiding Arbitrator

ICC Arbitration – 23261/TO
Partial Award on Liability

## TABLE OF CONTENTS

| | | |
|---|---|---|
| A. | **Parties** | **2** |
| B. | **Arbitral Tribunal** | **4** |
| C. | **Arbitration Agreement and Governing Law** | **5** |
| D. | **Procedural Law And Relevant ICC Rules** | **6** |
| E. | **Procedural Background** | **6** |
| F. | **Factual Background** | **10** |
| G. | **Requests for Relief** | **20** |
| H. | **Analysis of Claims** | **20** |
| I. | Breach of the duty to inform under clause 3 | 23 |
| II. | Breach of the due process duty under clause 3 | 41 |
| III. | Breach of clause 5 in relation to Information Requests | 42 |
| I. | **Costs** | **46** |
| J. | **Summary of the Arbitral Tribunal's Findings** | **46** |
| K. | **Proposed Directions on Causation and Quantum Hearing** | **46** |
| L. | **Dispositive** | **48** |

ICC Arbitration – 23261/TO
Partial Award on Liability

**ICC Arbitration No. 23261/TO**

1.      This arbitration concerns a claim arising under a Settlement Agreement dated 3 May 2013 signed by the Claimant and by the Respondent and the Ministry of Health of the Cook Islands (the "**Ministry of Health**") relating to the Claimant's application to reopen a Medical School in the Cook Islands (the "**Settlement Agreement**").[1]

**A.      PARTIES**

2.      The Claimant is Dwane L. Hubbart, a United States citizen residing in the State of Florida, U.S.A. ("**Dr. Hubbart**" or the "**Claimant**").

3.      The Claimant's contact details are as follows:

> **Dwane L. Hubbart**
> 20533 Biscayne Blvd # 1315
> Aventura
> 33180, Florida, U.S.A.
> Telephone:      + 1 305 934 5371
> Email:      dwanehubbart@aol.com

4.      The Claimant is represented in these proceedings by:

> **Ms Amanda Lee**, Consultant
> Seymours
> 502-503 Davina House
> 137-149 Goswell Road
> London EC IV 7ET
> United Kingdom
> Telephone:      +44 20 8798 0150
> Email:      amanda.lee@seymourslaw.com
>
> **Mr Stephen Iorns**
> 16 Ocean Parade
> Pukerua Bay
> Wellington 5026
> New Zealand
> Telephone:      +64 4 974 9121
> Email:      stephen@iornslegal.co.nz

---

[1] B1/2.

ICC Arbitration – 23261/TO
Partial Award on Liability

**Mr David Phillips QC**
Wilberforce Chambers
8 New Square, Lincoln's Inn
London WC2A 3QP
United Kingdom
Telephone:   +44 20 7236 2956
Email:        dphillips@wilberforce.co.uk

5.   The Respondent is the Government of the Cook Islands, a sovereign state located in the South Pacific in free association with the state of New Zealand. ("**Cook Islands**" or the "**Respondent**").

6.   The Respondent's contact details are as follows:

**Ms Catherine Evans**, Crown Counsel
Te Akinanga O Te Ture I Crown Law Office
PO Box 494
Avarua, Rarotonga
Cook Islands
Telephone:     +(682) 29337
Email:        catherine.evans@cookislands.gov.ck

7.   The Respondent is represented in these proceedings by:

**Mr Andreas Frischknecht**
**Mr James Hosking**
**Ms Erin Valentine**
Chaffetz Lindsey LLP
1700 Broadway 33rd Floor
New York, NY 10019
U.S.A.
Telephone:    + 1 212 257 6960
Email:    andreas.frischknecht@chaffetzlindsey.com
          james.hosking@chaffetzlindsey.com
          erin.valentine@chaffetzlindsey.com

8.   The Claimant and the Respondent are collectively referred to as the "Parties."

3/48

ICC Arbitration – 23261/TO
Partial Award on Liability

**B.    ARBITRAL TRIBUNAL**

9.    The Claimant nominated Mr William Wood QC as its party-appointed arbitrator in
these proceedings. Mr Wood's contact details are as follows:

> **Mr William Wood QC**
> Brick Court Chambers
> 7-8 Essex Street
> London WC2R 3LD
> United Kingdom
> Telephone:    +44 20 7379 3550
> Email:    william.wood@brickcourt.co.uk
> Clerk:    Ms Kate Trott (kate.trott@brickcourt.co.uk)

10.    The Respondent nominated Mr Murray Rosen QC as its party-appointed arbitrator. Mr
Rosen's contact details are as follows:

> **Mr Murray Rosen QC**
> 4 New Square
> London WC2A 3RJ
> United Kingdom
> Telephone:    +44 20 7822 2000
> Email:    m.rosen@4newsquare.com
> Clerk:    Nick Angliss (n.angliss@4newsquare.com)

11.    The ICC Secretary General confirmed the nomination of Mr Wood and Mr Rosen as co-
arbitrators in these proceedings on 30 January 2018.

12.    On 15 February 2018, pursuant to Article 13(4) of the ICC Rules, the International
Court of Arbitration of the International Chamber of Commerce appointed Ms Juliet
Blanch as the president of the arbitral tribunal. Ms Blanch's contact details are as
follows:

> **Ms Juliet Blanch**
> Arbitration Chambers
> Lamb Building, 3rd Floor South
> Temple, London EC4Y 7AS
> United Kingdom
> Telephone:    +44 20 7167 2040
> Email:    juliet.blanch@arbitrationchambers.com

4/48

## C.     ARBITRATION AGREEMENT AND GOVERNING LAW

13.     The arbitration agreement is found in clause 13 of the Settlement Agreement which provides as follows:

> ***Arbitration and Waiver of Sovereign Immunity.***
>
> *Any dispute, controversy, or claim arising out of, relating to, or in connection with this Settlement Agreement, including with respect to the formation, applicability, breach. termination, validity or enforceability thereof, shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("Arbitration"). The tribunal shall consist of three arbitrators, one arbitrator appointed by each Party and the third, who shall be the President of the tribunal, appointed by the Court of Arbitration of the International Chamber of Commerce. The seat of Arbitration shall be London, England, and the proceedings shall be conducted in English.*
>
> *The Arbitration shall be final and binding on the Parties. The Parties undertake to carry out any award rendered in the Arbitration without delay. The Parties explicitly waive any right to refer any question of law and any right of appeal on the law and/or merits to any court.*
>
> *For the avoidance of doubt, and without regard to any provisions of Cook Islands law and without regard to paragraph 12 above, the Cook Islands Government Parties hereby irrevocably waive any claim to sovereign or any other immunity in regard to (i) participation on the Arbitration and (ii) proceedings before any competent court to enforce (a) the Arbitration agreement contained herein or (b) any Arbitration award rendered by a tribunal constituted pursuant to this Settlement Agreement.*

14.     The applicable law is found in clause 12 of the Settlement Agreement which provides as follows:

> *12. Choice of Law. This Settlement Agreement and all actions or proceedings arising directly or indirectly from this Settlement Agreement, shall be governed by Cook Islands law (without regard to conflict of law principles).*

**D.      PROCEDURAL LAW AND RELEVANT ICC RULES**

15.      By clause 12 of the Settlement Agreement, the Parties have agreed that the applicable law is the law of the Cook Islands. By clause 13 of the Settlement Agreement, the Parties have agreed that the seat of the arbitration is London, England and as a result of this choice the English Arbitration Act 1996 applies to these arbitration proceedings.

16.      The rules governing these arbitration proceedings are the Rules of Arbitration of the International Chamber of Commerce, in force as from 1 March 2017 (the "ICC Rules").

**E.      PROCEDURAL BACKGROUND**

17.      This section is not intended to be an exhaustive summary of all of the correspondence between the Tribunal and the Parties but rather serves simply to summarise the procedural background of this arbitration to date.

18.      On 5 December 2017 the ICC Secretariat received a Request for Arbitration dated 4 December 2017 with Exhibits Al, A2, B - Q, RI, R2s and T.

19.      On 11 December 2017 the ICC Secretariat received electronic copies of the Request for Arbitration.

20.      On 21 December 2017 the Respondent received the Request for Arbitration.

21.      On 9 January 2018 the Claimant wrote to the ICC Secretariat by email to confirm payment of US$113,000 pursuant to a payment request dated 8 December 2018.

22.      On 10 January 2018 the ICC Secretariat wrote to the Parties advising that the time for submitting the Answer pursuant to Article 5(1) expired on 22 January 2018 and further acknowledging receipt of the US$113,000 from the Claimant.

23.      On 19 January the Cook Islands Crown Law Office wrote to the ICC Secretariat attaching the Respondent's request for an extension of time to 5 February 2018 to serve its Answer pursuant to Article 5(2).

24.      On 22 January 2018 the ICC Secretariat wrote to the Parties granting the Respondent to 5 February 2018 to submit its Answer and confirming that the ICC Court would appoint the president of the Tribunal.

25.    On 1 February 2018 Chaffetz Lindsey wrote to the ICC Secretariat explaining it had been engaged to represent the Respondent and seeking a further extension of time to 5 March 2018 to submit the Answer.

26.    On 2 February 2018 the ICC Secretariat wrote to the Parties by email inviting the Claimant's comments by 5 February 2018 on the Respondent's request for an extension of time to 5 March 2018.

27.    On 5 February 2018 the Claimant wrote to the ICC Secretariat confirming it did not oppose the grant of an extension.

28.    On 5 February 2018 the ICC Secretariat granted the Respondent to 5 March 2018 to file its Answer.

29.    On 5 March 2018 the Respondent filed its Answer accompanied by Exhibits R-1 and R-2 and legal authority RL-1 by email and confirmed seven copies had been sent by courier.

30.    On 9 March 2018 the ICC Secretariat acknowledged receipt of the Answer to Claimant's Request for Arbitration.

31.    On 15 March 2018 the International Court of Arbitration of the International Chamber of Commerce extended the time limit for establishing the Terms of Reference until 30 April 2018.

32.    On 22 March 2018 the International Court of Arbitration of the International Chamber of Commerce fixed the advance on costs at US$ 475 000.

33.    On 23 March 2018 the Tribunal issued the Terms of Reference, in accordance with article 23 of the ICC Rules.

34.    On 2 April 2018 both Parties submitted to the Tribunal their Submissions on Proposed Procedural Directions, with the main disagreement between the Parties in terms of procedure being in relation to the bifurcation of the proceeding.

35.    On 5 April 2018 the Case Management Conference took place by telephone conference, in accordance with article 24 of the ICC Rules. By a letter of the same date, the ICC Court established that the time limit for rendering the Final Award started to run on 23 March 2018.

36.    By email of 17 April 2018 the Tribunal was informed of the Parties' agreed procedural timetable, which detailed, among other issues, their agreement on bifurcation of the proceedings.[2]

37.    On 20 April 2018 the Tribunal issued and communicated to the Parties its Procedural Order No. 1. On the same date, the ICC Secretariat confirmed that it had received the Claimant's payment of its share of the advance on costs and requested the Respondent to proceed with payment by 23 April 2018.

38.    On 23 April 2018 the ICC Secretariat advised that it had received the Respondent's payment of its share of the advance on costs.

39.    On 18 May 2018 the Claimant filed its First Memorial on Liability ("**Claimant's First Memorial**").

40.    On 24 May 2018 the ICC Secretariat informed the Tribunal and the Parties that the ICC Court had fixed 22 March 2019 as the time limit for the final award.

41.    On 29 June 2018 the Respondent filed its First Memorial on Liability ("**Respondent's First Memorial**").

42.    On 13 July 2018 the Parties submitted to the Tribunal their Joint List of Preliminary Issues of Liability pursuant to paragraph 4 of Procedural Order No. 1 ("**Joint List of Issues**").

43.    By email dated 26 September 2018 the Claimant's legal representatives requested a short extension of time for the filing of his Reply Memorial on Liability. In the email, the Claimant's legal representatives informed the Tribunal that the Parties reached an agreement to allow the requested extension of time to 2 October 2018, while also allowing an extension for the Respondent to file its own Reply Memorial on Liability to 13 November 2018. On 27 September 2018 the Tribunal granted the Claimant's request.

44.    On 2 October 2018 the Claimant filed his Reply Memorial on Liability to the Tribunal ("**Claimant Reply Memorial**").

---

[2] *"1.       The Parties agree that the arbitration shall be bifurcated to allow for (1) a Partial Final Award on all issues other than damages, i.e. findings of liability (including declaratory relief) (the "Liability Phase") followed by (2) a Final Award that also addresses damages (the "Damages Phase"). If there is a finding of no liability in the Liability Phase, then that determination shall be recorded in a Final Award."*

45.     On 19 November 2018 the Respondent filed its Reply Memorial on Liability to the Tribunal ("**Respondent Reply Memorial**").

46.     On 26 November 2018 the Parties filed their Joint Expert Report on Cook Islands Law, signed by Mr Upton and Mr Weston QC ("**Cook Islands law Experts Joint Opinion**") and advised the Tribunal that both Parties agreed that it was unnecessary to call either expert for oral testimony. The Tribunal confirmed its agreement to this on 27 November 2018.

47.     On 27 November 2018 the Parties filed their Joint Expert Report on Quality Assurance in Tertiary Education, signed by Ms Popovic and Mr Sherwin.

48.     On 7 December 2018 the Parties filed their respective Pre-Hearing Briefs.

49.     By letter dated 10 December 2018 the Respondent advised that as of 5 December 2018 Senior Crown Counsel Mr Stuart Baker replaced Mr David James as the Solicitor General of the Cook Islands and further sought the Tribunal's consent to Mr Baker observing the first day of the hearing via Zoom video and then being available telephonically. The Respondent confirmed the Claimant had consented to this. The Tribunal provided its consent on 12 December 2018.

50.     On 14 December 2018 the Tribunal issued its Pre-Hearing Order, containing provisions on the Scope of the Pre-Hearing Order, Hearing Dates, Seat, Written Submissions, and proceedings for the Hearing on the Merits.

51.     The Hearing on the Merits took place between 17 and 19 of December 2018 (the fourth and last day of the hearing having been adjourned to 8 January 2019).

52.     On the first day of the hearing the Tribunal heard opening submissions from Mr Phillips on behalf of the Claimant and Mr Hosking on behalf of the Respondent. In addition, Mr Phillips advised the Tribunal that he would not be calling the Respondent's fact witness, Ms Cochrane, to give her testimony.

53.     On the second day of the hearing Mr Hosking completed his opening submissions and the Tribunal then heard the testimony of Dr Hubbart and Mr Lewis, the Respondent's fact witnesses.

54.     On the third day of the hearing the Tribunal heard the remainder of Mr Lewis' testimony together with the testimony of Ms Popovic (the Claimant's Quality Assurance in Tertiary Education expert) and Mr Sherwin (the Respondent's Quality Assurance in Tertiary Education expert).

55.   On 4 January 2019 the Respondent filed its Post-Hearing Brief and on 6 January 2019 the Claimant filed his Post-Hearing Brief.

56.   On 8 January 2019 Mr Phillips on behalf of the Claimant and Mr Hosking on behalf of the Respondent made their oral closing submissions.

57.   On 14 January 2019, the Parties jointly answered the Tribunal's Request for Additional Documentation.

58.   On 11 March 2019 the Tribunal declared the proceedings closed with respect to the matters to be decided in this Award in accordance with Article 27 of the ICC Rules.

59.   On 14 March 2019 the International Court of Arbitration of the international Chamber of Commerce extended the time limit for rendering the final award until 30 April 2019 pursuant to Article 30(2) of the ICC Rules.

## F.     FACTUAL BACKGROUND

60.   Between about 1 May 1998 and 24 July 1998 the Claimant entered into contracts with the Cook Islands Ministry of Health to establish and operate the St. Mary's School of Medicine in the Cook Islands ("**SMCI**"), a private tertiary education provider offering nursing and medicine training programmes ("**the Contracts**").

61.   The Claimant alleges that the Respondent breached the Contracts in about December 2008, preventing the Claimant from continuing to operate SMCI.

62.   In 2009, the Claimant sought the Respondent's approval to restart SMCI but this was denied. The Parties unsuccessfully sought to achieve a resolution of the resulting dispute and on 20 November 2011 the Claimant filed a civil lawsuit against the Respondent in the United States District Court for the District of Columbia seeking compensation for the breach of the Contracts.

63.   In response, the Respondent filed a motion to dismiss the claim in its entirety on multiple grounds.

64.   The principal focus in the DC proceedings was that the Respondent had acted so as to prevent the continued or resumed operations of the St. Mary's School of Medicine. While the motion to dismiss was pending, the Parties concluded the Settlement Agreement which, *inter alia*, made provision for the manner in which any new

application by SCMI should be considered by the Respondent. The relevant provisions of the Settlement Agreement are as follows:

> "**2. _Discontinuance of the Action and Dispatch of Letters_**. *Upon execution and exchange of this Settlement Agreement by all Parties, the Cook Islands Government Parties and their counsel shall execute and provide to Hubbart's counsel a Joint Stipulation of Dismissal with prejudice in the form attached hereto as Exhibit C. The Joint Stipulation of Dismissal shall be executed and filed electronically with the Court by Hubbart's counsel immediately upon his receipt of emails attaching (i) PDF copies of two original letters in the form attached hereto as Exhibit A and a PDF copy of the letter in the form attached hereto as Exhibit B (with shipment tracking information confirming that the originals having been sent by Federal Express or comparable international courier service) to Hubbart; and (ii) shipment tracking information confirming that further original copies of the letter in the form attached hereto as Exhibit A have been sent by Federal Express or comparable international courier service to the seven designated entities identified in subparagraphs (a) through (g) of paragraph 1 above.*
>
> **3. _New Application to Operate a Medical School_.** *Upon the filing of the Joint Stipulation of Dismissal pursuant to paragraph 2 of this Settlement Agreement, the Cook Islands Government Parties agree and acknowledge that Hubbart shall be free to apply to the competent Cook Islands authorities for any and all necessary approvals, licenses, permissions and/or authorizations to operate a medical school under the name of St. Mary's School of Medicine in the Cook Islands. The Cook Islands Government Parties further agree and acknowledge that any events preceding the date of this Settlement Agreement, including without limitation the events at issue in the Action and the fact that Hubbart commenced the Action, shall not constitute grounds to deny any such application; provided. however, that the competent Cook Islands authorities shall retain full discretion and authority to deny or impose appropriate conditions on any such application if and to the extent that it is not in compliance with all applicable provisions of law in effect at the time such application is made. The Cook Islands will inform Hubbart clearly and distinctly of what is needed to obtain approvals in the event an application is denied and how to cure any deficiencies in order to obtain the required approvals. The Cook Islands Government will not oppose any application for approvals on the basis of the historical relationship between the Plaintiff and the Cook Islands Government and will undertake to ensure that any applications are dealt with expeditiously and without bias, and that such applications will be*

*considered in good faith without imposing any unfair, extreme or unusual Impediments.*

**4. <u>New Medical School Agreement</u>.** *No new agreement for the St. Mary' School of Medicine to operate in the Cook Islands has been developed, negotiated and/or approved by the Cook Islands Cabinet as of this time. The Parties agree to negotiate in good faith in order to achieve a new medical school Agreement and Charter for the establishment of the St. Mary's School of Medicine, including approval and ratification of the same by the Cook Islands Cabinet, within twelve (12) months of the Action being dismissed. Cook Islands law will govern the new medical school Agreement. As set out in Exhibit B, St. Mary's School of Medicine's BTJB registration will remain in effect for a period of not less than one year from the date of execution of this Settlement Agreement and, if good faith negotiations by Hubbart are ongoing beyond that time, St. Mary's School of Medicine can seek and will be granted further extensions of the registration.*

**5. <u>Responding to information requests regarding St. Mary's School of Medicine</u>.** *The Cook Islands Government Parties agree to respond in a timely and expeditious manner to any and all requests by third parties regarding St. Mary's School of Medicine and will contact and notify Hubbart prior to responding to any of these requests. The Cook Islands agrees not to provide any incorrect information regarding St. Mary's School of Medicine. The current contact information for Hubbart is: (a) email: drdwenehub̲ ̲ ̲̲ ̲̲@̲ ̲.com and ̲ ̲me̲.̲rog@aol.̲om (b) Address: 20533 Biscayne Blvd PMB# 1315, Aventura, FL 33180. If the contact information for Hubbart changes, Hubbart will notify the Crown Law Office of any changes.*

*.........*

**Annex A**

**Execution Copy**

**[Ministry of Health Letterhead]**

**[Date], 2013**

*Re: St. Mary's School of Medicine*

*To Whom It May Concern:*

12/48

*I have been asked by the St. Mary's School of Medicine to issue this letter to confirm the status of the St. Mary's School of Medicine and its programs taught.*

*The St. Mary's School of Medicine on April 28, 1998 first received approval in principle (subject only to clearances) from the Cabinet of the Cook Islands (which is a Cabinet of Ministers comprising in part the Prime Minister, the Minister of Health, the Minister of Education and is the executive decision-making body for the Cook Islands Government) to operate as an educational institution of higher learning. Thereafter, the St. Mary's School of Medicine commenced operations offering: (A) a 3 year 4 months Doctor of Medicine Degree program for those students who already have a Bachelor's Degree or have already completed a minimum of 90 semester credit hours of undergraduate coursework including the completion of the required pre-medical sciences at an accredited institution; and (B) up to a 2 year nursing program for those students who have already completed at least an Associate's Degree or 2 years of undergraduate coursework including the completion of the required pre- nursing sciences at an accredited institution.*

*The Cabinet of the Cook Islands allocated the authority of coordination for the establishment of the St. Mary's School of Medicine to the then Secretary of Health. The requirements were formed for the accreditation of the programs taught by the St. Mary's School of Medicine. The St. Mary's School of Medicine programs taught were then granted accreditation, approval, and recognition in the Cook Islands by the then Secretary of Health. The graduates of the St. Mary's School of Medicine are eligible to practice Medicine and Nursing in the Cook Islands subject to the requirements of the Cook Islands Medical Council and the Cook Islands Nursing Council.*

*The St. Mary's School of Medicine was listed in the World Health Organization Directory of Medical Schools 7th Edition publication at the request of the Cook Islands Ministry of Health.*

*The St. Mary's School of Medicine accreditation, approval, and recognition granted by the then Secretary of Health served as the accreditation, approval and recognition for the programs taught*

*by the St. Mary's School of Medicine in the Cook Islands. It is my understanding that St. Mary's School of Medicine anticipates resuming new classes in 20 14 and the St. Mary's School of Medicine will further make the necessary applications pursuant to the Education Act 2012.*

ICC Arbitration – 23261/TO
Partial Award on Liability

*If you have any concerns or questions requiring my attention, please do contact me.*

*Sincerely,*

*[Name of Secretary of Health]*

*Secretary of Health*

*Ministry of Health*

*P.O. Box 109*

*Avarua, Rarotonga*

*Cook Islands*

**Annex B**

**Execution Copy**

**[Business Trade Investment Board Letterhead]**

*[Date], 2013*

*Dwane L. Hubbart*

*20533 Biscayne Blvd.# 1315*

*Aventura, FL 33 I 80*

*United States of America*

*Re: <u>Foreign Enterprise Registration Certificate for the St. Mary's School of Medicine</u>*

*Dear Mr. Hubbart:*

*This letter will serve to confirm that the Foreign Enterprise Registration Certificate for the St. Mary's School of Medicine will remain in effect for a period of not less than one year from the date of this letter.*

*Please contact the undersigned should you have any questions concerning this letter.*

*Sincerely,*

*[Chief Executive Officer of the BTIB]*

14/48

65.   Shortly before the Settlement Agreement was concluded, on 12 December 2012, Royal assent to the Cook Islands Education Act 2012 (the "**Education Act**") was given.[3] The relevant provisions of the Education Act are as follows:

> *PART 1*
>
> *PRELIMINARY*
>
> *4 Interpretation*
>
> *(…)*
>
> *private tertiary education means tertiary education provided in or from an institution that is not a government tertiary education institution or an internationally recognised university*
>
> *PART 2*
>
> *The Minister, Ministry and Secretary*
>
> *7 Minister for Education*
>
> *(…)*
>
> *(2) The Minister may delegate any of his her [sic] powers under this Act to any person he considers appropriately qualified.*
>
> *8 Secretary of Education*
>
> *(…)*
>
> *(3) The Secretary may delegate any of his her [sic] powers under this Act or any other enactment to any employee of the Ministry he considers appropriately qualified.*
>
> *(4) But the Secretary must not delegate a power that the Minister has delegated to the Secretary without the Minister's written consent to do so.*
>
> *PART 3*
>
> *Establishment and registration*
>
> *12 Private tertiary education providers to be registered*

---

[3] B1/1.

*(1) Private tertiary education must not be provided by any person unless he or she is a registered tertiary education provider.*

*(2) A person who provides private tertiary education while not registered as required by subsection (1) commits an offence, and is liable on conviction*

   *(a) to the penalty prescribed for a very serious offence; and*

   *(b) if the offence is a continuing offence, to the penalty prescribed for a continuing very serious offence.*

**13 Application for registration of private school or private tertiary education provider**

*(1) Any person may apply in writing to the Minister, on a form approved by the Minister for the purpose*

   *(a) to register a private school; or*

   *(b) to register as a private tertiary education provider.*

*(2) The application must be accompanied by the prescribed application fee.*

*(3) The Minister may require the applicant*

   *(a) to provide any additional information that the Minister reasonably requires to consider the application; and*

   *(b) to confirm by statutory declaration any element of the application (or of any additional information required by the Minister) that the Minister requires.*

*(4) The Minister must refuse to consider the application if the applicant fails to*

   *(a) comply with subsection (2); or*

   *(b) provide any information required under subsection (3)(a); or*

   *(c) confirm by statutory declaration any element of the application (or of any additional information required by the Minister) that the Minister has required under subsection (3)(b).*

*(5) Subsection (4) overrides section 14(1).*

**14 Decision on application**

*(1) Promptly after receiving an application under section 13, the Minister must consider whether the school or provider concerned:*

> *(a) is likely to fulfil a need in the Cook Islands; and*

> *(b) meets the prescribed criteria for the registration of private schools or private tertiary education providers (as the case may be).*

*(2) If not satisfied that the school or provider docs the things stated in subsection (1)(a) and (b), the Minister must refuse the application.*

*(3) If satisfied that the school or provider does the things stated in subsection (1)(a) and (b), the Minister*

> *(a) may, with the approval of Cabinet, register the school or provider, (unconditionally, or subject to conditions); or*

> *(b) may refuse the application.*

*(4) The Minister must promptly give the applicant written notice of his or her decision.*

*(5) If he or she has registered the school or provider subject to conditions, the notice must state the conditions.*

**15 Registration**

*(1) The Minister registers a private school or provider by entering in a register established and maintained by the Secretary for the purpose:*

*(…)*

> *(d) any conditions to which the registration is subject.*

**PART 5**

**Education Guidelines**

**84 Instructions relating to the Education Guidelines**

*(…)*

*(2) A private tertiary education provider must provide tertiary education consistently with, the Education Guidelines.*

**PART 6**

**Formal Qualifications**

**Subpart 2 – Approval of Qualifications by Secretary**

*86 Application of subpart 2*

*(1) This subpart applies only while the Cook Islands Qualification Authority is not established under subpart 3.*

*(2) The establishment of the Authority does not prevent the application of section 87 to events occurring before that establishment.*

*87 Approval to provide formal qualification*

*(1) A private school or private tertiary provider commits an offence if, without the Secretary's approval to provide a formal qualification, it*

> *(a) provides or offers to provide a formal qualification; or*

> *(b) holds out any course of study that it provides or offers to provide as a course leading to a formal qualification.*

*(2) On conviction, a person who commits an offence against subsection (1) is liable to the penalty prescribed for a serious offence.*

*88 Application for approval to provide formal qualification*

*(1) A registered private school or registered private tertiary education provider may apply to the Secretary for approval to provide a formal qualification.*

*(2) The application must be in writing in the form approved by the Secretary and accompanied by the prescribed fee.*

*(3) The Secretary may require the applicant to do either or both of the following*

> *(a) provide any other information that the Secretary reasonably requires to consider the application;*

> *(b) confirm any aspect of the application by statutory declaration.*

*89 Decision on application*

*(1) As soon as practicable after receiving an application for approval to provide a qualification, the Secretary must consider whether the school or provider meets the prescribed criteria for approval in relation to the qualification.*

*(2) If the Secretary is satisfied that the school or provider meets the prescribed criteria, the Secretary may*

> *(a) approve the application with or without conditions; or*

18/48

*(b) refuse the application.*

*(3) If the Secretary is not satisfied that the school or provider meets the prescribed criteria, the Secretary must refuse the application.*

*(4) The Secretary must promptly advise the applicant, in writing, of the Secretary's decision.*

66.    On 3 February 2014 the Claimant submitted SCMI's completed Application Form for Registration as a Private Tertiary Provider (International) for the provision of nursing and medicine training (the "**Initial Application**").[4]

67.    On 9 May 2014 the Respondent wrote to the Claimant enclosing an assessment detailing those criteria in which the Initial Application was either deficient or insufficiently answered (the "**Assessment Criteria**") and specifying that the missing information was to be provided by 1 September 2014.[5]

68.    On 1 September 2014 the Claimant submitted under cover of a number of emails his responses to the Respondent's request for additional information (the "**Further Information**").[6]

69.    On 17 October 2014 the Minister of Education wrote to the Claimant advising:

    *"(...)*

    *I have considered your application and I am not satisfied that your application meets the requirements of section 14(1)(a) and 14(1)(b) of the [Education Act] and accordingly I am giving you notice pursuant to section 14(2) and 14(4) of the [Education Act] that your application is refused.*

    *This decision is final and no correspondence will be entered into".[7]*

70.    The Claimant alleges that the manner in which the Respondent considered the Initial Application and the Further Information was in breach of its obligations pursuant to

---

[4] B1/4.
[5] B1/7.
[6] B2/8 (it should be noted that neither Party was able to produce the emails and there was uncertainty as to whether the documents in B8 comprised the totality of the information and documentation submitted by the Claimant.
[7] B2/9.

clause 3 of the Settlement Agreement. The Claimant further alleges that the Respondent is in breach of clauses 4, 5 and 10 of the Settlement Agreement.

71.    The Claimant filed his Request for Arbitration on 4 December 2017 detailing eight causes of action.

### G.    REQUESTS FOR RELIEF

72.    The Claimant's request for relief is set out in paragraph 91 of the Claimant's First Memorial:

      i.    A declaration that Respondent has breached its obligations to Claimant as set out in ¶¶ 131 to 202 of the Request;

      ii.    A declaration that the Tribunal's Award is final and binding on the parties;

      iii.    Costs; and

      iv.    Such additional or other relief as may be just.

73.    The Respondent's request for relief is set out in paragraph 113 of the Respondent's First Memorial:

      i.    Deny Claimant's claims in their entirety and dismiss the same with prejudice;

      ii.    Order Claimant to reimburse Respondent for all arbitration fees and expenses including attorney's fees and expenses; and

      iii.    Award any other relief that the Tribunal considers just and proper.

### H.    ANALYSIS OF CLAIMS

74.    The Claimant asserts eight separate causes of action arising out of the Settlement Agreement. The first three causes of action arise out of alleged breaches of clause 3 of the Settlement Agreement and consist of allegations that: (i) the Respondent's requirement that the Claimant supply external accreditation of SCMI's programmes before it could be registered as a private tertiary education provider was a breach of

its own domestic laws; (ii) the Respondent did not advise the Claimant clearly and distinctly of what was needed to obtain approvals to operate SCMI in breach of its obligation, which obligation arose at the time of the denial of the application; and (iii) the Respondent did not consider the Claimant's applications in good faith.

75.    The Claimant's fourth cause of action arises from an alleged breach of clause 4 of the Settlement Agreement which, the Claimant asserts, is a stand-alone provision requiring the Respondent to negotiate in good faith the agreement and charter for the establishment of the SCMI within twelve months of the DC litigation being dismissed. This claim was not maintained in the Claimant's Reply Memorial.

76.    The fifth and sixth causes of action arise from alleged breaches of clause 5 as a result of the Respondent's failure firstly to notify the Claimant of third-party requests for information about SCMI and secondly, knowingly to provide incorrect information to third parties.

77.    The seventh cause of action arises from alleged breaches of clause 10 in relation to the warranties given at the time of executing the Settlement Agreement. This claim was again not maintained in the Claimant's Reply Memorial.

78.    The eighth cause of action is the claim for costs pursuant to clause 14.

79.    Whilst the Claimant quantifies his loss as US$24,132,603.00, he limits his claim in this arbitration to the sum of US$20 million.

80.    The Tribunal will assess these contentions by addressing the following issues:

      a.    Did the Respondent breach its duty to inform under clause 3 of the Settlement Agreement?

         i.    The timing of the obligation;

        ii.    The scope of the obligation; and

       iii.    The deficiencies:

            1.    Cook Islands need;

            2.    External Accreditation;

      3.   Culpability and hopelessness; and

      4.   The minor deficiencies.

  b.  Did the Respondent breach its due process duty under clause 3?

  c.  Did the Respondent breach its information requests obligations under clause 5?

### Cook Islands law on contractual interpretation

81.   The Tribunal first notes that the Parties' experts on Cook Islands law are in substantial agreement as to (i) the relevant principles of contractual interpretation under Cook Islands law and (ii) the substantive law applicable to the exercise of contractual discretion, contractual good faith obligations and misrepresentation claims.[8] In summary the relevant principles for us to consider when construing the relevant provisions of the Settlement Agreement are as follows:

  a.  Primary regard should be had to the guidance found in the following English Supreme Court judgements: *Arnold v Britton*[9] and *Wood v Capita Insurance Services Ltd.*[10]

  b.  The starting point for contractual interpretation is the natural and ordinary meaning of the words actually used in the context of the document as a whole and tested against the general structure of the bargain.

  c.  The subjective intentions of the Parties are not admissible.

  d.  There is no Cook Islands guidance on how a contractual obligation of good faith should be approached but a Cook Islands court would be likely to look to New Zealand judgements and commentary for guidance. In particular, the experts agreed the following principles:

      i.  A court should be open to giving meaning to an obligation of "good faith";

---

[8] Cook Islands law Experts Joint Opinion, para 5.
[9] [2015] UKSC 36.
[10] [2017] UKSC 24.

  ii. What good faith requires is context specific; and

  iii. If one party is given a discretion, good faith will extend to not exercising that discretion arbitrarily, capriciously or unreasonably: the party exercising that discretion must be true to the ideal that lies behind the contract.

82. The Tribunal now turns to clause 3 of the Settlement Agreement.

  **I.** **Breach of the duty to inform under clause 3**

83. Clause 3 of the Settlement Agreement is set out in full at paragraph 64 above. It contains a protocol governing the new applications which the Claimant intended to make to enable him to re-start his medical school. The third sentence of clause 3 imposed an obligation to give the Claimant certain information *"in the event an application is denied"*. There were obligations in that event *"to inform the Claimant clearly and distinctly of what is needed to obtain approvals"* and *"to inform the Claimant clearly and distinctly ... how to cure any deficiencies in order to obtain the required approvals."*

84. The background to the allegation of breach of the duty to inform is as follows:

| | | |
|---|---|---|
| Dr. Hubbart writes to the Cook Islands indicating he will make a new application | F2/75 | 23/7/13 |
| The Cook Islands sends Dr Hubbart an application form | F2/77 | 18/9/13 |
| Dr Hubbart submits his Application Form | B1/4 | 3/2/14 |
| Assessment Criteria completed and letter of rejection drafted (but not sent) | F3/80 | 30/4/14 |
| The Cook Islands send Assessment Criteria to Dr Hubbart (omitting the concluding comments) together with a letter requesting further information. | B1/7 | 9/5/14 |
| Dr Hubbart writes seeking documents | Not available | 19/6/14 |
| The Cook Islands replies to his request | F3/84 | 20/6/14 |
| Dr Hubbart submits extensive Further Information by means of a series of emails | B2/8 and F3/87 | 1/9/14 |

| | | |
|---|---|---|
| The Assessment Criteria exercise is repeated and further comments added to reflect the Further Information. These are never seen by Dr Hubbart. | B2/10 | ? |
| The Cook Islands send letter of rejection to Dr Hubbart | B2/9 | 17/10/14 |

85.    Both sides accept that obligations to inform did arise under clause 3 in this case but there are fundamental differences between the Parties as to the scope of those obligations and as to their timing and consequently as to breach.

86.    The Claimant's case on breach in outline is that:

   a.   "*in the event an Application is denied*" means that the relevant conduct is required of the Respondent <u>after</u> a refusal.

   b.   The letter of refusal of 17 October 2014 gave no substantive reasons and concluded with the words *"This decision is final and no further correspondence will be entered into".* The lack of any advice then or thereafter necessarily demonstrates a breach of clause 3.

   c.   Even if the duty came into existence and could be performed prior to refusal the guidance given by the Respondent (principally in the Assessment Criteria) was inadequate to satisfy the *"clearly and distinctly"* obligations.

   d.   The only relevance of the scale of the deficiencies was that the greater they were and the worse the application then the greater was the duty to assist.

87.    The Claimant asks us to find that there was an overall breach as well as breaches in respect of individual deficiencies in the Application as to which he should have received more help.

88.    The Respondent's case that there was no breach is in outline that:

   a.   The words "*in the event an Application is denied*" do not indicate that the duty can only be performed after a formal refusal.

   b.   The Assessment Criteria can therefore be taken into account. They were, in the face of the original application, an adequate performance of the duty to advise "*clearly and distin*ctly", both as to the deficiencies and as to what was required to obtain approval.

24/48

     c.  No further performance of that duty was required following receipt of the Further Information because the Respondent was, at that point, relieved of any liability to advise further. This is because the scale of the deficiencies which persisted in the Further Information was such and they were so fundamentally incurable that by that stage there was no longer any duty to advise under clause 3.

89.    The issue as to whether *"curability"* was relevant to the construction of clause 3, has been the subject of extensive submission before us.

### The timing of the obligation

90.    It was strongly pressed by the Claimant that the plain sense of the words *"in the event an Application is denied"* in clause 3 was that the duty arose *from and after* the denial of an application. The Claimant's submission is that nothing given to him by way of advice prior to denial of the Application could therefore be taken into account in assessing the breach.

91.    The Respondent's case is that as and when a denial otherwise became appropriate the duty to advise arose and no formal denial would actually be issued. In effect the clause should be read as saying *"where absent this agreement it would otherwise be appropriate to deny the Application the Cook Islands will instead be obliged to inform the Applicant clearly and distinctly …"*. The duty arose at the point at which any other applicant would simply have received a refusal. They took comfort from the evidence of the Claimant that he was expecting to have his original application improved without having to make a fresh application (or presumably pay a fresh application fee).[11]

92.    The Respondent argues that the reference to *"curing any deficiencies"* implies that the original application would be improved rather than that a fresh application would have to be made.

93.    The principal significance of this issue was said to be that the Respondent is entitled to rely upon the Assessment Criteria supplied on 9 May 2014 as performance of the obligation. On reflection it is not clear to us that the timing issue is critical. Whatever view we took it would have been necessary in any event to measure the Assessment Criteria against the contractual duty to advise because, as we explain further below, the duty to advise necessarily takes account of all previous conversations and exchanges between the Parties.

---

[11] T2/58:19 – 59:7 and T2/174:11-23.

94.   In any event reading clause 3 as a whole it is clear that there was not one single application in prospect but that the *"application"* is a collective description of all of the various applications requiring to be made in the Cook Islands before students could be admitted and charged fees. The first sentence of clause 3 includes the words *"…Hubbart shall be free to apply to the competent Cook Islands Authorities for any and all necessary approvals, licenses, permissions and/or authorizations to operate a medical school …"*. It seems to us to follow that the duty to advise is therefore a continuing obligation which sits in the background throughout all of these processes and applies in relation to all of the necessary applications as they are successively made.

95.   On balance we think the duty arose and therefore could be discharged before and after actual refusal. On any view therefore we have to turn to the Claimant's secondary case that the Respondent was still in breach because the advice contained in the Assessment Criteria was insufficient.

**The scope of the obligation**

96.   We propose to proceed by applying the words of clause 3 to the deficiencies that we find to have existed in the Application to see whether the duty to advise was performed satisfactorily. The opening and closing submissions as well as the cross examination of the expert and fact witnesses were all concentrated understandably on the two major deficiencies, those in respect of need and external accreditation.

97.   We decline to make an overall finding of breach of the kind sought by the Claimant in closing. He sought a finding that the Respondent's letter of final denial was, on its own and without more, a breach of the contract. We think a single finding of breach would be inappropriate and that the Claimant must make out a case as to <u>what should have been said</u> in order to comply with the Settlement Agreement.

98.   It was accepted by both Counsel that the obligation to inform had certain sensible limits. It was for example accepted that if it had been necessary to cure a deficiency by recruiting a particular doctor with a particular expertise, it would be sufficient for the Respondent to point that out. The Respondent would not have to go further and identify an individual or contact a candidate for the Claimant.

99.   Although there was no suggestion that it was necessary to imply any modifying language to the terms of clause 3 it does seem to us that only reasonable steps were necessary and that it was not, for example, a matter for the Respondent to fill out and complete the Application. The same was broadly accepted by the Claimant in his Closing Submission. Paragraph 36 of the Closing Submission stated that *"because it (CI)*

26/48

*had a statutory duty as the determining authority it was not possible for it to be actively involved in preparing and completing the Application."*

100.    We also have well in mind the significant language earlier in clause 3:

> *"...the competent Cook Islands Authorities shall retain full discretion and authority to deny or impose appropriate conditions on any such application if and to the extent that it is not in compliance with all applicable provisions of law in effect at the time such application is made."*

101.    Taking all of the elements of clause 3 together it cannot have been the intention of the Parties that they would be locked into a never-ending cycle of rejection and correction. At some point necessarily the Settlement Agreement seems to us to contemplate that the reiterations of the application would either finally succeed or finally fail with no further duty to advise.

102.    Late in the proceedings, the Claimant began to develop a case that he should have been advised by the Respondent to retain as a consultant somebody like the Respondent's expert Mr Sherwin. We reject that suggestion. That might have been good advice, but clause 3 does not require general advice as to the conduct and organisation of the project. It only requires information as to <u>what</u> was needed to obtain approvals and <u>how</u> particular deficiencies should be cured.

### The background to the alleged breaches

103.    Some overall points about the background to the case on breach and the way that the Claimant's application was handled should be borne in mind:

a.  This was the first of only two applications which have ever been made to the Respondent for the registration of a tertiary education institution.

b.  The form completed by the Claimant had been assembled by Mr. Lewis of CITTI on the basis of a New Zealand Qualification Authority ("**NZQA**") precedent effectively in response to the Claimant's indication he would be making an application.

c.  There was no explanatory guidance around the form or otherwise available to the Claimant although, as we have recorded above, the Clamant had available to him the Education Act and a number of policy documents for which the links had been supplied to him. While the Act refers to *"prescribed criteria"* for registration there were no written criteria either in the public domain or held

27/48

privately within the Cook Islands' government – at least not until the application form and the Assessment Criteria were drawn up by Mr Lewis.

d.   The Assessment Criteria form was itself only assembled for the purpose of dealing with this application after the completed form had been received and again an NZQA precedent was used.

e.   Mr. Lewis was unaware when he compiled the criteria and indeed when he filled it in in respect of this application of the *"clearly and distinctly"* obligation in paragraph 3 of the Settlement Agreement. He simply did his job administering the internal processes of the application and chose the words he used in completing the assessment exercise accordingly.[12]

f.   The first Mr. Lewis learnt of the Settlement Agreement (and specifically the provisions of clause 3) came when he was told that the application could not be flatly rejected as he had proposed but that instead the table pages of the completed Assessment Criteria would be sent to the Claimant with a request for further information. Indeed, the first time Mr Lewis saw the Settlement Agreement was during the course of his oral testimony.[13]

g.   The Claimant was only shown the table-format pages of the Assessment Criteria and he did not see the concluding comments. The revised assessment criteria brought into being prior to the formal rejection being sent were not seen by the Claimant at all (until disclosure in these proceedings).

h.   Mr. Lewis accepted frankly more than once in his evidence that, if asked, he could have given more assistance to the Claimant than was provided by the Assessment Criteria.[14]

### The deficiencies

104.   We deal first with the two deficiencies which came to be referred to as the major deficiencies: need and external accreditation.

### Major deficiency 1: Cook Islands need

---

[12] T2/183:8-15, T2/191:5-9, T3/8:17-24
[13] T2/182:17-184:25.
[14] T2/195:2-196:15, T2/202:8, T2/221:9-20, T3/8:2-9, T3/10:22-13:6 and T3/42:12-17.

105. The importance of establishing *"Cook Island need"* rests upon the express requirements of the Education Act 1912. This provides at Section 14 as follows:

> *"14(1) … The Minister must consider whether the school or provider concerned: … (a) is likely to fulfil a need in the Cook Islands; (…)"*

106. Paragraph 6 of the Application form contains the following:

> *"Section 14 Statement*
>
> *This Application Form, supporting documentation, and quality management system evidence must be accompanied by a statement on how this private tertiary education provider will fulfil a need in the Cook Islands (Section 14 Education Act 2012)."*

107. The Claimant completed the form and answered question 6 as follows:

> *"See explanation – Exhibit J, page 103."*

108. Exhibit J[15] provided as follows:

> *"Section 14 Statement:*
>
> *The Operations of St Mary's School of Medicine will contribute by creating jobs and enhancing the local economic vitality of the Cook Islands. St. Mary's School of Medicine will contribute to primary health care in the Cook Islands by being focussed on providing scholarship opportunities for those Cook Islanders who may wish to apply and upon being accepted enrol in any one of the programmes offered. This will enable Cook Islanders to utilise their knowledge and skills attained to serve the community and healthcare delivery in the Cook Islands. St. Mary's School of Medicine will also provide upon request access to facility and educational equipment by the local Cook Islanders who are studying science/biology and may want to use the laboratories or other educational aids to enhance their knowledge and skills. St. Mary's School of Medicine will actively support local Cook Islands non-profit community organisations by making donations or contributions."*

---

[15] B1/4 at p.196.

109. There were further references to a similar mixture of economic benefit and potential advantages for local Cook Island residents[16] but they do not add appreciably to what is said at Appendix J.

110. In the Assessment Criteria document[17], the relevant points arise at questions 13, 14, 15 and 17 as follows:

| 14. | Does the application support Cook Islands Human Resource Development? | x | Exhibit B page 17 highlights a goal to contribute to the local community through making Cook Islanders aware of scholarships available to St Mary's programmes, possible donations by St Mary's to Cook Islands not for profit entities, and the offer that St Mary's facilities and resources may be available for the use of the wider community. The application provides no link to any Cook Islands Human Resource Development. |
|---|---|---|---|
| 15. | Does the application show consultation and input from Cook Islands industry and/ or government to address a need? | x | No evidence has been provided. |
| 16. | .... | | |
| 17. | Is the application in direct competition with any existing training provision in the Cook Islands? | x | Training in the area of Nursing is already being delivered by the Cook Islands Tertiary Training Institute. The Diploma of Nursing through CITTI is recognised by the Cook Islands Nursing Council and has had peer reviews by a number of tertiary institutions in New Zealand. |

---

[16] B1/4 at pp.89, 95 and 98.
[17] B1/7 at p. 210.

111.    The comments attached on the last page of the Assessment Criteria (which the Claimant did not see) included the following:

> *"There is no clear connection with Cook Islands government strategy or direction. There is no clear connection with the Cook Islands industry, and it appears that there is little Cook Islands input into the initiative … training in the area of nursing and dentistry is already being delivered by the Cook Islands Tertiary Training Institute. The diploma of nursing through CITTI is recognised by the Cook Islands Nursing Council and has had peer reviews by a number of tertiary institutions in New Zealand. In addition, CITTI is currently in the process of gaining accreditation with the New Zealand Qualifications Authority ("NZQA") to deliver this programme in country. This will enable all graduates to have an internationally recognised qualification. The Application does not show that there is an additional need to extend upon what is currently being provided in country and does not have the accreditation to improve options for students."*[18]

112.    On 19 June 2014 the Claimant contacted the Ministry of Education by email to ask for copies of the various documents referenced in the Assessment Criteria.[19] He received either copies of these or links through which they could be obtained under cover of the Ministry of Education's reply of 20 June 2014.[20] Paragraph 4 of that letter suggests that the Claimant had also raised a question about the Cook Islands need issue. The reply states as follows:

> *"(4) Ref paragraph 14. This requires you to explain how your institution will contribute towards the development of Cook Islanders – i.e. HRM specifically for Cook Islanders."*

113.    Unfortunately, we do not have the Claimant's email of 19 June 2014 to be able to be absolutely sure of his question.

114.    Possibly because of this indication, when the Claimant returns to the issue of need in the Further Information provided on 1 September 2014, he does so with greater emphasis on potential advantages to local Cook Island students and with less significance attached to the economic benefits of the presence of foreign students in the Cook Islands. The new material is at Exhibit D of the Further Information under the heading Contribution to Cook Islands Human Resource development.[21] This exhibit

---

[18] B1/6 at p.207.
[19] This document did not form a part of the record.
[20] F3/84.
[21] B2/8 at p.459.

lists potential benefits for students who might either develop and pursue an interest in a career in the healthcare industry or could work as interns in administrative positions, professionals such as Practicing Nurses within the Cook Islands who could receive further training, local Cook Islander nurses and doctors who could be faculty members, administrative staff who could work at the school as well as the general contribution of medical and nursing faculty members in directly providing healthcare assistance to Cook Islanders. Significantly there is also a section in Exhibit D as follows:

> *"Consultation with the Government of the Cook Islands.*
>
> *The Government of the Cook Islands (Cabinet) approved the St. Mary's School of Medicine in April 1998.*
>
> *The Government of the Cook Islands has no opposition and supports the application submitted to the Ministry of Education. This information may be verified with the Crown Law Office."[22]*

115.     It is clear that the Claimant was again seeking to use SMCI's previous incarnation and the "reassuring" parts of the Settlement Agreement to satisfy the requirement of Cook Islands Consultation.

116.     The reaction to the treatment of need in the new document was reflected in the red text which was then included in lines 13, 14, 15 and 17.

| 13 | Does the applicant support a priority need of the Cook Islands as identified in the National Sustainability and Development Plan, Education Master Plan and the Tertiary Education Strategy? | √/ X | The application pays no reference to any of these documents. However, the application does support a need for nursing training. However, this need is being met through the delivery of a Diploma of Nursing in the Cook Islands through the Cook Islands Tertiary Training Institute in conjunction with the Cook Islands Ministry of Health. <br> In offering the Nursing programme the applicant would be duplicating an already existing programme of study being offered as a partnership between the Ministry of Health and the Cook Islands Tertiary Training Institute. It offers no external accreditation and therefor offers no added value to the Cook Islands. |
| 14 | Does the applicant support Cook Islands Human Resource Development? | X √ | Exhibit B page 17 highlights a goal to contribute to the local community through making Cook Islanders aware of scholarships available to St Mary's programmes, possible donations by St Mary's to Cook Islands not for profit entities, and the offer that St Mary's facilities and resources may be available for the use of the wider community. The application provides makes no link to any Cook Islands Human Resource Development. <br> This information has now been remastered and a number of opportunities for Cook Islands human resource have been identified. |
| 15 | Does the application show consultation and input from Cook Islands industry and/ | X | No evidence has been provided. <br> A Letter from the Secretary of Health has been received. The letter provided does not indicate support of this application nor does it indicate that this application represents a response to a need. The current delivery |

---

[22] B2/8 at p.460.

| | | | |
|---|---|---|---|
| | or government to address a need? | ✓/ X | of a Nursing Diploma by CITTI and the Ministry of Health and offshore training of Doctors is servicing the needs at present. |
| 17 | Is the application in direct competition with any existing training provision in the Cook Islands? | X X | Training in the area of Nursing is already being delivered by the Cook Islands Tertiary Training Institute. The Diploma of Nursing through CITTI is recognised by the Cook Islands Nursing Council and has had peer reviews by a number of tertiary institutions in New Zealand. Plans and curriculum is currently being developed by CITTI and the Ministry of Health to deliver a Dental Practitioners programme. This application is duplicating existing training arrangements & provision in the Cook Islands. |

117. The comments section at the end of the Assessment Criteria includes the following final sentence:

> *"There is a clear duplication of existing training involved in this application. This is unlikely to change."*[23]

118. Finally, Mr Philips drew our attention to an important passage in the evidence of Ms Cochrane who said in respect of the need requirement at paragraph 15 of her witness statement:

> *"While the Applicant must articulate a real, identifiable need in the Cook Islands, the relevant need is not limited to educational needs – it could also be a business or economic need."*[24]

119. The treatment of Cook Islands' need in both the original application and in the Further Information was clearly deficient. What then is the advice that should have been given in respect of need? Ultimately the Claimant's case came to focus firmly on a passage in Mr Lewis' evidence where he suggested that if external accreditation had been obtained then the question of need would have been much easier to assess positively.[25] This is self-evident in relation to nursing because, as Mr. Lewis said, the existing nursing training only entitled nurses to practice as nurses in the Cook Islands. There would no longer be duplication if the St. Mary's nursing training entitled nurses to practice overseas. We also accept that the position in respect of the medical school in respect of need would similarly have been transformed if external accreditation had been obtained. Whether either application would ultimately have succeeded in dealing with the question of need under the 2012 Act it is not our immediate concern

---

[23] B2/10 at p.468
[24] C6/93.
[25] T2/213:23-214:3.

to establish. As the issue of need is so intimately bound up with external accreditation, we postpone further discussion until we have examined the second major deficiency.

***Major deficiency 2: External accreditation***

120.   It seems to us to be an obvious preliminary consideration to ask an overseas applicant for registration, whether they already hold an accreditation conferred in another jurisdiction. Section 4 of the Application Form is headed Quality Management System. It contains five separate sections, institutional governance, human resources management, financial and infrastructural management, curriculum and programme management and student support and management. At sub-paragraph (iv) of *"4.4 curriculum and programme management"* we find a request for the provision of *"copies of external accreditation agreements for qualification programmes identified in Part 3 of this Application, e.g. NZQA, London City & Guilds, The Association of Commonwealth Universities"*.

121.   When he reached this part of the Form the Claimant replied as follows:

> *"Initially the only approvals, recognitions and accreditations required for the medical/healthcare programmes to be offered by the St Mary's School of Medicine will be from the appropriate authorities in the Cook Islands.*
>
> *Upon the proper approvals, recognitions and accreditations from the appropriate Cook Islands authorities being granted to the St. Mary's School of Medicine for the medical/healthcare programmes to be offered, the St. Mary's School of Medicine with the assistance of the appropriate Cook Islands authorities may then be eligible to seek additional accreditations e.g. the USA National Committee on Foreign Medical Education and Accreditation (NCFMEA) and NZQA, etc."* [26]

122.   When the Assessment Criteria came to be prepared the relevant box, box 16 provided as follows:

---

[26] B1/4 at p.152.

| 16. | Is the training accredited by a currently recognised provider? | x | • Exhibit B Institutional Governance page 9 states that the strategic plan is based in part on "the granting and maintaining of the approvals, recognitions and accreditation by the appropriate Cook Islands authorities for the medical/healthcare programmes to be offered including the inclusion in the Cook Islands National Register of Qualifications".<br>• Exhibit B page 67 states that the only accreditation required is that of the appropriate authorities in the Cook Islands and approval from this body may allow St Mary's to be eligible to seek additional accreditation with USA National Committee on Foreign Medical Education and Accreditation and NZQA.<br><br>No evidence that this criteria [sic] is currently being met. |

123.   In a crucial section of the concluding comments to the Assessment Criteria, which the Claimant did not see, Mr. Lewis records as follows:

> *"The Applicant has no accreditation with the internationally renowned qualification Authority. It mentions a Cook Islands National Register of Qualifications, which does not exist. It is reliant on the Cook Islands to provide it with the accreditation. The Cook Islands does not have a qualifications framework nor any body/organisation to issue accreditation to training institutions."[27]*

124.   The Further Information deals with external accreditation first of all at internal page 6 as part of the overview statement. The Claimant there says:

> *"prior accreditation of the nursing and medical programmes from the Ministry of Health/Secretary of Health will transition to accreditation from the Cook Islands Qualifications Authority or the appropriate accreditation body/authority (Education Act 2012)."[28]*

125.   The statement also refers to the earlier establishment of the St. Mary's School of Medicine and its operation in the Cook Islands. The question is returned to in slightly more detail at internal page 118[29] (which again refers to the *"Cook Islands Qualification Authority (and/or any other appropriate Cook Islands Authority)"*

---

[27] B1/6 at p.207.
[28] B2/8 at p.272.
[29] B2/8 at p.384.

granting accreditation to the medical and nursing programmes offered at St. Mary's School of Medicine for a period of 10 years. The Claimant refers to internal and external reviews of the performance of SMCI.

126. In the further edition of the Assessment Criteria created after the receipt of the Further Information, line 16 still receives a cross but the words "*No evidence that this criteria is currently being met*" are replaced by a note in red which reads:

> *"Accreditation is sought through Cook Islands Authorities. No internationally recognised accreditation body is accrediting the programme being offered."*[30]

127. Box 10 of Assessment Criteria, which had not previously dealt with accreditation now says this:

| 10 | Have the Quality Management System policies and procedures been provided? | X ✓ | A series of policies and statements have been provided. These lack detail and have been presented in a manner that has made it very difficult to follow. In an application of this nature it would be reasonable to expect provision of a full detailed set of policies as part of a Quality Assurance manual. A comprehensive Quality Assurance Manual has been received. Note: Page 6 & Page 95 of this manual states that prior accreditation of St Marys programmes will transition to the Cook Islands Qualifications Authority or the appropriate accrediting authority. The Cook Islands Tertiary Training Institute has no mandate to register a programme of this nature without approval from the Cook Islands Nursing Council. Page 118 states that the Cook Islands Qualifications Authority and any other appropriate Cook Islands Authority will grant accreditation to St Marys for a period of 10 years. It also establishes a process from which Cook Islands Authorities should operate institutional reviews. This contravenes common Ministry practice. It also states that: the purpose of accreditation is the recognition of the institution programmes that produce graduates competent to safely practice as Doctor of Medicine interns and nurses in the Cook Islands and abroad … We are in no position to provide this guarantee and this should be referred to the Ministry of Health for consultation. A letter from Liz Iro has been included. |
|---|---|---|---|

128. It was at certain points suggested that external accreditation would only be one of a number of aspects of the general considerations feeding into a decision to accept or reject an application and that its omission was not necessarily fatal. We think that may be true in developed jurisdictions such as New Zealand which are in a position to make their own minds up. It may also be true of the Cook Islands in relation to less demanding disciplines than medicine and nursing. However, we find that the medical or nursing academy was never going to receive its first, "ground-up" registration or accreditation in the Cook Islands. It was going to have to start the process elsewhere. That was recognised <u>internally</u> in the conclusion section of the Assessment Criteria by

---

[30] B/10 at p.467.

Mr. Lewis. The question is whether that was shared with the Claimant to a sufficient extent.

### Breach: The major deficiencies

129.    The Tribunal has decided by a majority that (for the following reasons and in the following respects) the Respondent did act in breach of clause 3 of the Settlement Agreement.[31] In our view the principal breach of the clause 3 duty was the failure to tell the Claimant to seek accreditation elsewhere.

130.    We recall that the Respondent did not contend that it was never called upon to give information to the Claimant. The Respondent's case was that it was required to give information in the face of the original Application. The question therefore largely narrows to whether the indications given in the disclosed parts of the Assessment Criteria gave sufficiently clear and distinct advice to the Claimant on this fundamental point. That advice, we remind ourselves, took the form of the comment in the right-hand box set out at paragraph 122 above. This consisted of a summary of the relevant parts of the Claimant's application and the words: "*No evidence that this criteria* [sic] *has been met.*"

131.    It seems to us, having heard all the evidence, that the passing reference in 4.4(iv) of the Application Form had done little to advertise the importance of the requirement at the outset. Line 16 of the Assessment Criteria seems to us in its comments to be much too oblique. The Claimant was not told "*clearly and distinctly*" as he should have been to go away and re-imagine his application by seeking accreditation and registration elsewhere. Indeed this, the single most critical area in which information was required by clause 3, was accorded no particular prominence in amongst the various other considerations with their various ticks and crosses. The Claimant has been criticised for maintaining his stubborn and mistaken belief that the Settlement Agreement entitled him to be fully accredited and registered in all respects within the boundaries of the

---

[31] One member of the Tribunal did not agree with this finding. That arbitrator considered that the Claimant had failed to prove that the Respondent did not "*clearly and distinctly inform [him] of what was needed … and how to cure any deficiencies …  in order to obtain the required approvals*". The Claimant's proposal for a medical school in the Cook Islands was misconceived and hopeless from start to finish; he was informed (by the application form and then the criteria assessment form) of what was needed and then what was missing; the remaining "deficiencies" (i.e. failures to provide what was needed) were egregious and incapable of being cured; the theoretical suggestion that he should "reimagine" his proposal, seek to obtain accreditation outside the Cook Islands and then reapply in the Cook Islands (for an entirely different proposal, which he himself said was out of the question) was far beyond the Respondent's defined duty to inform.

Cook Islands. Certainly, that view was mistaken. But the Settlement Agreement entitled him to be disabused in clear and distinct terms of that misapprehension. That did not happen.

132.    To be clear the Respondent was not under an obligation to tell the Claimant *how* to pursue an application in another jurisdiction or even which jurisdiction to go to. The Claimant rightly pursued no case to that effect.

133.    In view of the way the Claimant has now (rightly in our view) yoked together the case for need and the case based upon external accreditation it does not seem to us that a separate finding of breach in respect of need would be correct except in one respect. It is clear to us that dialogue with the Respondent was going to be necessary to satisfy the need criteria. (Thus, if and when the Claimant returned to renew his Cook Island applications he would inevitably have to liaise with Cook Island entities and authorities.) The application form prepared by the Respondent did not refer to this requirement at all. That may be why the Claimant's application also did not refer to it at all. The Assessment Criteria asked the question in box 15 whether the application "*showed consultation and input from Cook Islands industry and/or government to address a need*". In completing it Mr Lewis stated in line 15 that there was no evidence of consultation with Cook Island entities.

134.    In his further information, the Claimant made some effort to deal with this point in the passage quoted in paragraph 116 above. In a sense the duty was once again to disabuse him as to the significance (or lack of it) of the Settlement Agreement and the previous incarnation of the medical school. He needed to be told that this approach was inadequate and that it was going to be necessary to consult the Cook Islands entities afresh. He was not so advised. This is a much more difficult decision because the question and answer in box 10 of the Assessment Criteria could be said to be tolerably clear if somewhat terse. But on balance these exchanges appear to us to give rise to a further breach of the "*clearly and distinctly*" obligation.

### Culpability and hopelessness

135.    The Claimant may be said to have demonstrated an unwillingness to seek external accreditation in some of his answers before us, but his evidence four years later is nothing to the point. His application, as made and supplemented by the Further Information, called up a duty to advise under clause 3 of the Settlement Agreement. Equally, the Respondent was entitled to decline the application if the rules required it to do so and clause 3 did not oblige the Respondent repeatedly to give advice that was either being ignored or was incapable of being complied with. We have given the issue anxious consideration, but in our view the Claimant did not demonstrate such a

complete inability or unwillingness to respond to or follow advice in relation to accreditation or anything else as to forfeit that right.

136.   In other words, it is plain that the Claimant believed that the Settlement Agreement and the assurances given in the letter appended to it entitled him to seek all the approvals he needed within the boundaries of the Cook Islands. He was mistaken. But we do not see that as excusing the breach by the Respondent. Instead, as we have found, that is the background against which the duty *"clearly and distinctly"* to advise arises.

137.   Two further points, relying upon matters of procedure, were relied upon by the Respondent in this regard and we should deal with them.

138.   First it was said that if we upheld any of the allegations of breach the Parties would be condemned to a pointless quantum hearing with expensive expert evidence. We discuss later in this Partial Award on Liability the proper course for dealing with the quantum issues in this case but even if this objection had force it could not affect the question of breach of clause 3.

139.   The Respondent also drew our attention to the List of Issues which at item 1.5 included the following among the disputed facts:

"Whether the alleged deficiencies in the application could be cured."[32]

140.   The Respondent submitted that there was therefore a concession or an agreement that it was germane to the issue of the breach of clause 3 to consider the curability of the deficiencies. It seems to us that the Respondent's case made it necessary to hear the evidence on curability in the hearing. But ultimately having analysed the Settlement Agreement as we have done, that evidence has not proved to be decisive. No doubt it will be material in any causation hearing.

### The minor deficiencies

141.   There were probably other less decisive deficiencies in the Application. It seems likely that the Claimant's treatment of, for example, corporate governance and conflict of interest, financial resources and staffing probably counted against him when the Application was refused without having been decisive.

---

[32] A/5 at p.151.

142.    We were left in the unusual position that the Claimant (who necessarily has the burden of proof in relation to breach) was non-committal in the Appendix to his final submissions as to whether particular minor matters were deficiencies or not and hence whether they gave rise to any breaches of duty or not.

143.    We can see that some of the deficiencies now apparent to us may well not have been apparent to the Cook Islands authorities so as to give rise to any duty to inform at all. To give just one example of the difficulties in this area it remained unclear to us whether the Cook Islands knew at the time of the Application that the three other members of the governing body proposed by the Claimant were respectively his wife, his mother and a friend. If CV's were supplied copies have not survived in the possession of either party. And if supplied they may or may not have disclosed the proposed members of the Governing Body's true connections to the Claimant. We strongly suspect they did not because the Claimant's proposed solution to a problem of conflict of interest was that he be President of the school and Dr Kamani Govender be the Chair of the Board of Trustees.[33] Dr Govender is the Claimant's wife. The Claimant's suggestion could hardly have been presented as a solution if the fact of their being married had been revealed. If the application did not reveal the deficiency, there could be no duty to advise.

144.    Other deficiencies may well have been sufficiently pointed out in the assessment criteria. An example would be student fee protection in paragraph 12 of the form.[34]

145.    Ultimately, we have concluded that it is unnecessary for us to make detailed findings about the minor deficiencies. Although the critical sentence in clause 3 is binary in form, the emphasis of both limbs is on the cure rather than the diagnosis: thus *"what is needed to obtain approval"* and *"how to cure any deficiencies"*. We do not therefore have to assess whether the Respondent catalogued the deficiencies of which they were aware in a clear and distinct manner. The question is simply whether they provided sufficient information in relation to curing deficiencies and obtaining approval.

146.    It appears to us that the proper approach is as follows:

     a.    It would have been pointless for the Respondent to advise the Claimant to improve his application in respect of the minor deficiencies because unless and until the major deficiencies had been corrected and external accreditation

---

[33] B8/460.
[34] B1/7 at p.210.

had been achieved it would have been a waste of effort to improve the Cook Islands application to register.

    b. Further in order for the external accreditation to be achieved (in a jurisdiction such as New Zealand which the Cook Islands would have found convincing and impressive) all of those issues would have needed to be addressed anyway.

    c. If the Claimant returned to the Cook Islands with, for example, New Zealand accreditation the minor deficiencies would, it is overwhelmingly likely, already have been addressed.

147. Consequently, as the majority of the Tribunal have found that there was a failure, in breach of clause 3, to advise the Claimant to seek external accreditation, any further investigation as to other unremarked deficiencies in other respects would not have led to the conclusion further or additional information needed to be given or that other breaches of clause 3 had occurred.

### The Tribunal's Determination on breach of the clause 3 duty to inform

148. The majority of the Tribunal therefore finds that the Claimant has established two breaches of the duty to give information under clause 3. The most significant breach was the Respondent's failure to inform the Claimant clearly and distinctly of the need first to obtain accreditation elsewhere, in a developed jurisdiction such as New Zealand, in order then to be able to obtain approval in the Cook Islands. Additionally, the Respondent also failed to inform the Claimant of the importance from the point of view of establishing need (when in due course his application in the Cook Islands was renewed) of consulting Cook Islands entities and the Cook Islands government about his plans.

### II.    Breach of the due process duty under clause 3

149. The centre of gravity of the Claimant's case was, at least by the time of the hearing, the duty to inform. There remained further alleged breaches in relation to the duty set out in the last sentence of clause 3 of the Settlement Agreement, namely the duty to:

> "(…) ensure that any applications are dealt with expeditiously and without bias, and that such applications will be considered in good faith without imposing any unfair, extreme or unusual impediments."

150. We do not find any such breaches to have been established.

151.    The principal allegation for much of the hearing was that the requirement for external accreditation created an impossible *Catch 22* situation for the Claimant. It was in particular suggested that he should have been allowed to conditionally register in the Cook Islands and then go and seek external accreditation elsewhere. But the evidence was clear that a conditional Cook Islands registration would not advance the Claimant at all in any application he might make in, for example, New Zealand. He would need to apply to register and accredit in New Zealand in order to make any progress there.

152.    There was further alleged to have been a breach by virtue of the way in which the application form was drafted and the lack of any external guidance documents for the Claimant. The process was alleged to have been intrinsically unfair. We accept that the documents and the system being operated were relatively rudimentary. As detailed in paragraph 103.h) above, Mr. Lewis frankly admitted that it could have been improved. We have to bear in mind the restricted resources available to the Cook Islands, a consideration of which the Claimant would have been well aware. In all the circumstances and having heard Mr. Lewis' careful and frank account of these matters we do not think that the process or the documents gave rise to a breach of the due process obligation in their own right.

153.    The next ground was to the effect that the treatment was unfair when compared with that afforded to another establishment, the English Academy. But that allegation seems to us to add nothing whatever to the breach of the duty to inform which we have already dealt with.

154.    Finally, it was said to be unfair to *"attach blanket importance"* to the requirement of external accreditation when the medical school had previously had a successful existence in the Cook Islands. This allegation, although it formed part of the final memorandum, seems to us to be a relic of earlier positions adopted by the Claimant. There was no doubt in our mind that external accreditation simply <u>was</u> a blanket requirement. We think that in truth the Claimant ultimately came to accept that in the final formulation of his case.

III.    **Breach of clause 5 in relation to Information Requests**

155.    All of the Claimant's causes of action considered so far are claims that he was deprived of the opportunity of re-opening the medical school and a nursing school because of the way his application was dealt with. The last cause of action, to which we now turn, falls into a different category and is a claim for loss of reputation.

156.    The Claimant alleges a breach of clause 5 of the Settlement Agreement:

"5.    *Responding to information requests regarding St. Mary's School of Medicine.* *The Cook Islands Government Parties agree to respond in a timely and expeditious manner to any and all requests by third parties regarding St. Mary's School of Medicine and will contact and notify Hubbart prior to responding to any of these requests. The Cook Islands agrees not to provide any incorrect information regarding St. Mary's School of Medicine. (…) [the paragraph then gives current contract information for Dr Hubbart]".*

157.   The Claimant first says that an email dated 3 October 2014 and sent by the Crown Law Office to a Mr Maurizio of Josef Silny & Associates ("**JSA**") responding to a request for information about SMCI in September 2014 was misleading and inaccurate.[35] Secondly, he says that there was a failure by the Respondent to reply at all to an email from one Amy Opalek ("**Opalek**") dated 4 September 2014 from an organisation called FAIMER (Foundation for Advancement of International Medical Education and Research) who had written requesting information about, *inter alia*, SMCI.[36] He also says that neither enquiry had been notified to him as required by clause 5.

158.   We can deal with this matter fairly shortly.

159.   After this dispute broke out it was proposed and ultimately agreed, as both sides accept, that the problem could be dealt with by the sending of further corrective letters. That agreement was reached as follows:

a.   By email dated 17 March 2015, the Claimant's lawyers sent two draft letters to the Crown Law Office.[37] The first we will refer to as the Ministry of Health letter.[38] The second of these we will refer to as the letter of retraction.[39]

b.   By letter dated 16 April 2015 the Crown Law Office replied making it clear that they would be prepared (subject to drafting) to circulate a letter from the Ministry of Health but equally that the second letter, the letter of retraction, was something they could not contemplate. In paragraphs 26 and 27 of that letter they make it absolutely clear what it is that the Cook Islands would send and what it would not.[40]

---

[35] F3/88 and 91.
[36] F3/89.
[37] F3/103.
[38] F3/104.
[39] F3/105.
[40] F3/107.

c.   There were then further exchanges in which the drafting of the Ministry of
Health letter is worked upon, but no further mention is made of the letter
of retraction, only of the Ministry of Health letter. Indeed, on 13 May 2015,
the Claimant's lawyers provided a further draft of the Ministry of Health
letter and said:

> *"Further to our telephone conversation earlier in the week, I attach
> a revised version of the letter to be distributed by the Ministry of
> Health.*
>
> *(...)*
>
> *I have also attached a list of addresses to which Dr. Hubbart
> wishes the letters to be sent. They are all physical addresses;
> however, our client requests that additional copies be sent via
> email to Josef Silney & Associates and Amy Opalek, given their
> initial requests for information about St. Mary's via email."*[41]

d.   By email dated 20 May 2015 the Crown Law Office confirmed its agreement
in principle to distribute the letter to third parties, adding that *"the letter to
Josef Silney & Associates and Amy Opalek can be attached to an email and
a copy of the email forwarded to you for Mr. Hubbart."*[42]

e.   In an email of 26 May 2015, the Claimant's lawyer said:

> *"Our client is happy to forgo his claim for breach of clause 5 of the
> Settlement Agreement with regards to the 3 October 2014 email to
> Josef Silney & Associates and the Crown's non-response to Amy
> Opalek. He considers that the distribution of the letters by the
> Secretary of Health and the distribution of the letter by Crown Law
> Office to Josef Silney & Associates indicating the submission of a
> revised response sufficiently mitigates those breaches. However,
> he wishes to reserve his rights in respect of any future breaches
> and/or past breaches (of which he remains unaware) with regards
> to clause 5."*[43]

---

[41] F3/111.
[42] F3/113.
[43] F3/115.

    f.   We have before us a DHL Invoice confirming that a package containing a document or documents of some kind was sent to all intended recipients and the Claimant's lawyers on 17 June 2015.[44]

160.   The Claimant's response to the allegation that he has waived these claims is first to contend that the letters sent still contained inaccuracies about, in particular the period of operation of SMCI during the early part of the last decade. We are bound to say we can see no inaccuracies in the descriptions given and they appear to be entirely consistent with the evidence we have heard about the period of operation of the school in the Cook Islands. In circumstances in which the draft was agreed and the Claimant was obviously copied in this seems a hopeless contention.

161.   The Claimant's second response to the waiver case is to say that the agreement was conditional upon the letter of retraction being sent as well as the Ministry of Health letter. As the retraction was not sent that condition was not met and the waiver is therefore invalid.

162.   The immediate problem with this argument is that we are unable to construe these exchanges as a conditional agreement depending for its validity upon the performance of a condition subsequent. Instead this was an exchange of promises. Even if a breach of the Cook Islands' promise could be established the consequence would not be that the original claim for the breach of clause 5 would revive. The Claimant would be left with an even narrower claim for breach of the alleged free-standing agreement to send a retraction. That claim has not been advanced here.

163.   Nevertheless, we turn to the question of the scope of the obligation under the agreement. The words *"…the distribution of the letter by Crown Law Office to Josef Silney & Associates indicating the submission of a revised response…"* in the email of 26 May 2015 could, if taken wholly in isolation, be a reference to the letter of retraction. But if this was an attempt to re-introduce the requirement for a letter of retraction it was wholly unsuccessful. It is clear that the parties were discussing sending additional copies of the <u>same letter</u> to Silney and Opalek. It is those additional copies that are being referred to in the passage relied upon in the email of 26 May 2015.

164.   The Crown Law Office was thereafter completely transparent about what they were doing and what letters they were going to be sending and no complaint was raised by the Claimant or his lawyer until very much later when the waiver defence had been taken in the arbitration. No letter of retraction had ever been agreed and it was plain

---

[44] F3/120.

that none had been sent. It follows that there was in any event no breach of the waiver agreement.

165.   Consequently, we dismiss the claims for breach of clause 5.

## I.   COSTS

166.   The Tribunal makes no ruling as to costs in this Partial Award on Liability. All questions of costs are reserved and we do not invite submissions on the costs incurred to date at this stage.

## J.   SUMMARY OF THE ARBITRAL TRIBUNAL'S FINDINGS

167.   Based on the above analysis, the Tribunal summarises its findings below and states:

     a.   By a majority, the Tribunal finds that the Claimant's claim that the Respondent did not advise him clearly and distinctly of what was needed to obtain approvals to operate SCMI in breach of its obligation in clause 3 is upheld in the respects identified in paragraph 148 above;

     b.   All other claims brought by the Claimant are denied.

## K.   PROPOSED DIRECTIONS ON CAUSATION AND QUANTUM HEARING

168.   As detailed in paragraph 36 above, the Parties agreed that the proceedings would be bifurcated, with the first phase resulting in a Partial Final Award dealing with all issues other than damages (being findings of liability)[45] and for damages to be addressed in a second phase leading to a Final Award if liability were determined against the Respondent in the first phase.

169.   Given our determination (by a majority) that the Respondent is in breach of clause 3 of the Settlement Agreement, we now turn to the next phase of the proceedings. We have found that issues of causation (including the question of curability discussed at paragraphs 135-140 above) did not fall to be determined in this first phase of the arbitration and it was accepted by the Respondent that pursuant to the provisions of Procedural Order 1, issues of causation relating to damages did not form a part of the

---

[45] Procedural Order 1, A/2B para 1.

first phase of the arbitration.[46] Further, in considering whether the Respondent is in breach of the Settlement Agreement, we have not made any findings as to curability. We have not yet been addressed as to the applicable legal principles under Cook Islands law in relation to these issues.

170.   Whilst Procedural Order 1 envisages that there will only be two phases, with the second phase consisting of all issues of causation as well as the quantum of damages, if any, we are mindful of our obligations under ICC Article 22(1) to ensure this arbitration is conducted in an expeditious and cost-effective manner.

171.   The question of what the Claimant would have done had the Respondent complied with its obligations under clause 3 of the Settlement Agreement is clearly central to the question of whether any damages flow from the Respondent's breach. As noted by Mr Phillips, the quality of the advice given by the Respondent and what would have happened had the Respondent provided compliant advice are separate questions and we were not provided with the necessary evidence from the experts to determine this second question (the "**Causation Issue**").[47] However, the Causation Issue appears to us to be a discrete and concise issue which can and, given our obligations to minimise cost, should be determined first as, depending upon our determination, it may render redundant any hearing on quantum. Whilst we accept that, in the event the Claimant succeeds in proving causation, such further bifurcation could give rise to some delay in reaching our final determination on quantum, no specific issues of urgency were raised by either Party and it does not seem to us that it would be a particularly time consuming or costly exercise to obtain the necessary fact or expert evidence in respect of the Causation Issue. Accordingly, we are of the view that the appropriate way to proceed is for there to be a further bifurcated hearing limited to the Causation Issue and not including issues of quantum (the "**Causation Issue Hearing**"). At this Causation Issue Hearing we will first determine the legal principles applicable to the question of causation under Cook Islands law. We will then apply those principles to determine whether and, if so to what extent, the breaches of clause 3 found in paragraph 167.a) above caused the Claimant not to be able to open (or reopen) SCMI in the Cook Islands.

172.   The Parties have leave to apply to adduce further evidence of fact or law should they wish to do so; however, we note our understanding that most of the evidence on causation is already before us and we therefore anticipate that the Causation Issue Hearing will be relatively short.

---

[46] T1/142:5-8.
[47] T4/4:7-12.

47/48

173.   The Parties are therefore directed to agree a timetable for the filing of submissions and expert evidence in relation to the Causation Issue. If the Parties are unable to agree, the Tribunal will give further directions.

## L.   DISPOSITIVE

174.   For the reason set out above, the Tribunal, having heard all the evidence and submissions of the Parties, hereby DECLARES and ORDERS that:

   a.   By majority decision of the Tribunal, the Respondent did not advise the Claimant clearly and distinctly of what was needed to obtain approvals to operate SCMI in breach of its obligation in breach of clause 3 of the Settlement Agreement;

   b.   All other claims are dismissed;

   c.   The arbitration and legal costs relating to this Partial Award are reserved; and

   d.   The Tribunal reserves its jurisdiction in respect of the remaining issues in these proceedings.

   Place of Arbitration:      London, United Kingdom

   Date:      4 April 2019

   Signatures:

   **Mr William Wood QC**
   Co-Arbitrator

   **Mr Murray Rosen QC**
   Co-Arbitrator

   **Juliet Blanch**
   Presiding Arbitrator

# EXHIBIT "C"

**IN THE MATTER OF AN ARBITRATION UNDER THE 2017 RULES OF ARBITRATION OF**

**THE INTERNATIONAL CHAMBER OF COMMERCE ("ICC")**

**INTERNATIONAL COURT OF ARBITRATION**

ICC ARBITRATION NO. 23261/TO

BETWEEN

**DWANE L. HUBBART**

("Claimant")

**v.**

**THE GOVERNMENT OF THE COOK ISLANDS**

("Respondent")

---

**PARTIAL AWARD ON CAUSATION**

---

BEFORE

**Mr William Wood QC** – Arbitrator
**Mr Murray Rosen QC** – Arbitrator
**Ms Juliet Blanch** – Presiding Arbitrator

ICC Arbitration – 23261/TO
Partial Award on Causation

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| A. | Parties | 1 |
| B. | Arbitral Tribunal | 3 |
| C. | Arbitration Agreement | 4 |
| D. | Procedural Background | 5 |
| E. | Requests for Relief | 8 |
| F. | Factual Background | 9 |
| G. | The Parties' Cases | 12 |
| | Claimant's Case | 13 |
| | Respondent's Case | 17 |
| H. | The Tribunal's Analysis | 23 |
| | I.   Requirement 1 | 24 |
| | II.  Requirement 2 | 26 |
| | III. Requirements 3, 4 and 5 | 28 |
| | IV.  The alternative jurisdictions | 28 |
| I. | Costs | 29 |
| J. | Dispositive | 29 |

### ICC Arbitration No. 23261/TO

1.     This arbitration concerns a claim arising under a Settlement Agreement dated 3 May 2013 signed by the Claimant and by the Respondent and the Ministry of Health of the Cook Islands (the "**Ministry of Health**") relating to the Claimant's application to reopen a Medical School in the Cook Islands (the "**Settlement Agreement**").[1]

## A.     PARTIES

2.     The Claimant is Dwane L. Hubbart, a United States citizen residing in the State of Florida, U.S.A. ("**Dr. Hubbart**" or the "**Claimant**").

3.     The Claimant's contact details are as follows:

**Dwane L. Hubbart**
20533 Biscayne Blvd # 1315
Aventura
33180, Florida, U.S.A.
Telephone:     + 1 305 934 5371
Email:     dwanehubbart@aol.com

4.     The Claimant is represented in these proceedings by:

**Ms Amanda Lee**, Consultant
Seymours
502-503 Davina House
137-149 Goswell Road
London EC IV 7ET
United Kingdom
Telephone:     +44 20 8798 0150
Email:     amanda.lee@seymourslaw.com

**Mr Stephen Iorns**
16 Ocean Parade
Pukerua Bay
Wellington 5026
New Zealand
Telephone:     +64 4 974 9121
Email:     stephen@iornslegal.co.nz

**Mr David Phillips QC**[2]

---

[1] B1/2.
[2] Mr Phillips did not attend the Causation Hearing on 17 October 2019.

Wilberforce Chambers
8 New Square, Lincoln's Inn
London WC2A 3QP
United Kingdom
Telephone:   +44 20 7236 2956
Email:        dphillips@wilberforce.co.uk

5.     The Respondent is the Government of the Cook Islands, a sovereign state
       located in the South Pacific in free association with the state of New
       Zealand. ("**Cook Islands**" or the "**Respondent**").

6.     The Respondent's contact details are as follows:

       **Ms Catherine Evans**, Crown Counsel
       Te Akinanga O Te Ture I Crown Law Office
       PO Box 494
       Avarua, Rarotonga
       Cook Islands
       Telephone:      +(682) 29337
       Email:      catherine.evans@cookislands.gov.ck

7.     The Respondent is represented in these proceedings by:

       **Mr Andreas Frischknecht**
       **Mr James Hosking**
       **Ms Erin Valentine**
       Chaffetz Lindsey LLP
       1700 Broadway 33rd Floor
       New York, NY 10019
       U.S.A.
       Telephone:    + 1 212 257 6960
       Email:    andreas.frischknecht@chaffetzlindsey.com
                 james.hosking@chaffetzlindsey.com
                 erin.valentine@chaffetzlindsey.com

8.     The Claimant and the Respondent are collectively referred to as the
       "Parties."

B.      **ARBITRAL TRIBUNAL**

9.      The Claimant nominated Mr William Wood QC as its party-appointed
        arbitrator in these proceedings. Mr Wood's contact details are as follows:

        **Mr William Wood QC**
        Brick Court Chambers
        7-8 Essex Street
        London WC2R 3LD
        United Kingdom
        Telephone:     +44 20 7379 3550
        Email:      william.wood@brickcourt.co.uk
        Clerk:      Ms Kate Trott (kate.trott@brickcourt.co.uk)

10.     The Respondent nominated Mr Murray Rosen QC as its party-appointed
        arbitrator. Mr Rosen's contact details are as follows:

        **Mr Murray Rosen QC**
        4 New Square
        London WC2A 3RJ
        United Kingdom
        Telephone:     +44 20 7822 2000
        Email:      m.rosen@4newsquare.com
        Clerk:      Nick Angliss (n.angliss@4newsquare.com)

11.     The ICC Secretary General confirmed the nomination of Mr Wood and Mr
        Rosen as co-arbitrators in these proceedings on 30 January 2018.

12.     On 15 February 2018, pursuant to Article 13(4) of the ICC Rules, the
        International Court of Arbitration of the International Chamber of
        Commerce appointed Ms Juliet Blanch as the president of the arbitral
        tribunal. Ms Blanch's contact details are as follows:

        **Ms Juliet Blanch**
        Arbitration Chambers
        Lamb Building, 3rd Floor South
        Temple, London EC4Y 7AS
        United Kingdom
        Telephone:     +44 20 7167 2040
        Email:      juliet.blanch@arbitrationchambers.com

### C.     ARBITRATION AGREEMENT

13.     The arbitration agreement is found in Clause 13 of the Settlement Agreement dated 3 May 2013 (the **"Settlement Agreement"**) between the Claimant, the Respondent and the Ministry of Health of the Cook Islands (the **"Ministry of Health"**).

14.     Clause 13 of the Settlement Agreement provides as follows:

> *Arbitration and Waiver of Sovereign Immunity.*
>
> *Any dispute, controversy, or claim arising out of, relating to, or in connection with this Settlement Agreement, including with respect to the formation, applicability, breach. termination, validity or enforceability thereof, shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("Arbitration"). The tribunal shall consist of three arbitrators, one arbitrator appointed by each Party and the third, who shall be the President of the tribunal, appointed by the Court of Arbitration of the International Chamber of Commerce. The seat of Arbitration shall be London, England, and the proceedings shall be conducted in English.*
>
> *The Arbitration shall be final and binding on the Parties. The Parties undertake to carry out any award rendered in the Arbitration without delay. The Parties explicitly waive any right to refer any question of law and any right of appeal on the law and/or merits to any court.*
>
> *For the avoidance of doubt, and without regard to any provisions of Cook Islands law and without regard to paragraph 12 above, the Cook Islands Government Parties hereby irrevocably waive any claim to sovereign or any other immunity in regard to (i) participation on the Arbitration and (ii) proceedings before any competent court to enforce (a) the Arbitration agreement contained herein or (b) any Arbitration award rendered by a tribunal constituted pursuant to this Settlement Agreement.*

15.     The applicable law is found in clause 12 of the Settlement Agreement which provides as follows:

> *12. Choice of Law. This Settlement Agreement and all actions or proceedings arising directly or indirectly from this Settlement Agreement, shall be governed by Cook Islands law (without regard to conflict of law principles).*

16.     By clause 12 of the Settlement Agreement, the Parties have agreed that the applicable law is the law of the Cook Islands. By clause 13 of the Settlement Agreement, the Parties have agreed that the seat of the arbitration is London, England and as a result of this choice the English Arbitration Act 1996 applies to these arbitration proceedings.

17.     The rules governing these arbitration proceedings are the Rules of Arbitration of the International Chamber of Commerce, in force as from 1 March 2017 (the "**ICC Rules**").

## D.     PROCEDURAL BACKGROUND

18.     This section is not intended to be an exhaustive summary of all of the correspondence between the Tribunal and the Parties but rather serves simply to summarise the procedural background of this arbitration to date. The below summary takes into account events that occurred after the issuance of the Tribunal's Partial Award on Liability dated 4 April 2019.

19.     On 8 April 2019, the Secretariat notified the Parties that the Partial Award on Liability of 4 April 2019 was approved by the International Court of Arbitration of the ICC on 29 March 2019 and provided the Parties with an electronic copy of the Award.

20.     On 9 April 2019, the Tribunal issued its Procedural Order No. 2 ("**PO2**").

21.     On 18 April 2019, the International Court of Arbitration of the ICC extended the time limit for rendering the final award until 31 July 2019 in accordance with Article 31(2) of the ICC Rules.

22.     On 3 May 2019, the Parties wrote to the Tribunal with their agreed proposed procedural directions ("**Agreed Directions**").

23.     On 14 May 2019, the Claimant filed his Application to Adduce Further Evidence ("**Claimant's Application**") in respect of the causation issues.

24.     On 15 May 2019, the Respondent requested leave from the Tribunal to reply to the Claimant's Application by 20 May 2019.  The same day, the Tribunal ordered the Respondent to provide its response by 20 May 2019 and stated it would withhold issuance of Procedural Order No. 3 ("**PO3**") until it had determined the Claimant's application.

25.     On 20 May 2019, the Respondent filed its Response to the Claimant's Application ("**Response**").

26.     On 21 May 2019, the Claimant sought leave from the Tribunal to reply to Respondent's Response by 31 May 2019.  The same day, the Tribunal granted the leave sought by the Claimant.

27.     On 31 May 2019, the Claimant filed his Reply to the Respondent's Response ("**Reply**").

28.     On 4 June 2019, the Tribunal decided, in view of its obligations under Article 22(1) of the Rules, that it was not appropriate to determine the Claimant's application until it had reviewed the Claimant's Memorial on Causation due by 24 June 2019 and therefore gave directions to the Claimant specifying which issues were to be addressed in such memorandum.

29.     On 17 June 2019, the Claimant filed a third expert report on Cook Islands Law prepared by Mr Beniot Upton ("**Mr Upton**") and a memorandum prepared by Mr Tom Weston QC ("**Mr Weston**").

30.     On 24 June 2019, the Claimant filed his Memorial on Causation ("**Claimant's Memorial on Causation**"), appending a third witness statement from the Claimant ("**Hubbart 3**") and expert reports prepared by Ms Marina Matthews ("**Matthews 1**"), Mr Paul Gaston ("**Gaston 1**") and Mr Nicholas Russell ("**Russell 1**").

31.     On 28 June 2019, the Respondent wrote to the Tribunal requesting the Tribunal: (i) to dismiss the Claimant's additional evidence ; (ii) in the event the Tribunal were to grant leave for the Claimant to adduce the evidence disclosed with the Claimant's Memorial on Causation, to grant an extension of time for Respondent's Memorial on Causation ("**Respondent's Memorial on Causation**") by two weeks; and (iii) to give explicit directions regarding the Claimant's reservations to adduce new evidence.

32.     On 3 July 2019, the Tribunal wrote to the Parties: (i) holding that the additional evidence adduced by the Claimant in the Application would be admitted; (ii) advising that the Tribunal would take into consideration the Respondent's arguments when attributing weight to Ms Matthews' expert evidence; (iii) ordering that the Respondent had two additional weeks to serve its Respondent's Memorial on Causation; (iv) advising that the Tribunal would reserve its discretion on whether it would accept any further evidence from an expert witness; and (v) specifying its inclination to accept any request for limited discovery from the Respondent, if such a request were to be made.

33. On 11 July 2019, the International Court of Arbitration of the ICC extended the time limit for rendering the final award until 31 October 2019 in accordance with Article 31(2) of the ICC Rules.

34. On 19 August 2019, the Respondent filed its Respondent's Memorial on Causation appending a second expert report from Mr Peter Sherwin ("**Sherwin 2**").

35. On 9 September 2019, the president of the Tribunal wrote to the Parties acknowledging the arrangement made by the Parties for the hearing that took place on 17 October 2019, and asking them whether a mentor student, Ms Arya Nagwani, could attend the hearing for educational purposes.

36. On 10 September 2019, the Claimant wrote to the Tribunal indicating its acceptance to the attendance of Ms Arya Nagwani to the hearing, as well as providing a copy of the rebuttal expert report of Ms Matthews ("**Matthews 2**") for which he noted leave would be sought.  The Respondent further confirmed it did not object to Ms Arya Nagwani's attendance.

37. The same day, the Tribunal noted that the Claimant had until close of business the following day to file his application to adduce Ms Matthews' rebuttal report and that the Respondent would have until opening of business on 16 September 2019 to respond to this application.

38. On 11 September 2019, the Claimant filed its application to adduce responsive evidence of Ms Matthews.

39. On 16 September 2019, the Respondent sought leave for a two day extension to file its response to the Claimant's application to adduce the Ms Matthews Rebuttal Report to which the Claimant consented.  Accordingly, the Tribunal granted the Respondent two more days to provide any such reply.

40. On 18 September 2019, the Respondent wrote to the Tribunal noting its agreement to the Claimant's application for leave to adduce the further report from Ms. Matthews and additionally detailing the procedural timetable to commencement of the hearing and the hearing timetable which had been agreed between the Parties.

41. On 10 October 2019, the International Court of Arbitration of the ICC extended the time limit for rendering the final award until 29 November 2019 in accordance with Article 31(2) of the ICC Rules.

42.     On 11 October 2019, the Parties filed their respective Pre-Hearing Briefs on Causation ("**C PHB**" and "**R PHB**").

43.     On 17 October 2019, the hearing on causation took place at the International Dispute Resolution Centre in London, United Kingdom.  The Claimant was represented by Mr Iorns and Ms Lee and the Respondent was represented by Messrs Hosking, Frischknecht and Berman in person and Mr Baker, the Solicitor General of the Cook Islands participated by video conference.

44.     The hearing commenced with the oral testimony of Dr Hubbart, followed by the oral testimony by video link of Ms Matthews and Mr Sherwin.  The hearing concluded with oral closing submissions and reply submissions from Mr Iorns on behalf of the Claimant and Mr Hosking on behalf of the Respondent.

45.     On 14 November 2019, the International Court of Arbitration of the ICC extended the time limit for rendering the final award until 31 January 2020 in accordance with Article 31(2) of the ICC Rules.

46.     On 7 January 2020, the Tribunal declared the proceedings closed with respect to the matters determined therein in accordance with Article 27 of the ICC Rules.

47.     On 16 January 2020, the International Court of Arbitration of the ICC extended the time limit for rendering the final award until 28 February 2020 in accordance with Article 31(2) of the ICC Rules.

E.     **REQUESTS FOR RELIEF**

48.     The Claimant's request for relief is set out in paragraph 44 of the Claimant's Memorial on Causation:

      *a.  A declaration that the breach of the Settlement Agreement as determined in the Partial Award on Liability caused the loss of the Claimant's chance to register S.M.C.I. in the Cook Islands;*

      *b.  A determination of the procedure for the next phase; quantification of the value of that lost chance; and*

      *c.  An award of costs to date.*

49.   The Respondent's request for relief is set out in paragraph 59 of the
      Respondent's Memorial on Causation:

      a.  *Deny Claimant's claims in their entirety and dismiss the same
          with prejudice;*

      b.  *Order Claimant to reimburse Respondent for all arbitration fees
          and expenses, including attorney's fees and expenses; and*

      c.  *Award any other relief that the Tribunal considers just and
          proper.*

50.   The Parties have not addressed the Tribunal with respect to principles of
      costs or the quantum of costs claimed and accordingly the Tribunal reserves
      its jurisdiction with respect to costs and interest, if appropriate.

## F.  FACTUAL BACKGROUND

51.   The dispute between the Parties is set out in detail in the Partial Award on
      Liability.  In brief, having previously established and operated a medical
      school in the Cook Islands, the St Mary's School of Medicine in the Cook
      Islands ("**SMCI**"), the Claimant had sought to reopen it.  As a result of a
      dispute between the Parties as to the Claimant's right to do this, the Parties
      entered into the Settlement Agreement.  The relevant provision of the
      Settlement Agreement with respect to issues of causation is as follows:

      "***3. New Application to Operate a Medical School.*** *Upon the filing of
      the Joint Stipulation of Dismissal pursuant to paragraph 2 of this
      Settlement Agreement, the Cook Islands Government Parties agree and
      acknowledge that Hubbart shall be free to apply to the competent Cook
      Islands authorities for any and all necessary approvals, licenses,
      permissions and/or authorizations to operate a medical school under
      the name of St. Mary's School of Medicine in the Cook Islands. The Cook
      Islands Government Parties further agree and acknowledge that any
      events preceding the date of this Settlement Agreement, including
      without limitation the events at issue in the Action and the fact that
      Hubbart commenced the Action, shall not constitute grounds to deny
      any such application; provided, however, that the competent Cook
      Islands authorities shall retain full discretion and authority to deny or
      impose appropriate conditions on any such application if and to the
      extent that it is not in compliance with all applicable provisions of law in
      effect at the time such application is made. The Cook Islands will inform
      Hubbart clearly and distinctly of what is needed to obtain approvals in*

> *the event an application is denied and how to cure any deficiencies in order to obtain the required approvals. The Cook Islands Government will not oppose any application for approvals on the basis of the historical relationship between the Plaintiff and the Cook Islands Government and will undertake to ensure that any applications are dealt with expeditiously and without bias, and that such applications will be considered in good faith without imposing any unfair, extreme or unusual Impediments.*

52. Pursuant to the Settlement Agreement, on 3 February 2014 the Claimant submitted SCMI's completed Application Form for Registration as a Private Tertiary Provider (International) for the provision of nursing and medicine training (the "**Initial Application**").[3]

53. On 9 May 2014 the Respondent wrote to the Claimant enclosing an assessment detailing those criteria in which the Initial Application was either deficient or insufficiently answered (the "**Assessment Criteria**") and specifying that the missing information was to be provided by 1 September 2014.[4]

54. On 1 September 2014 the Claimant submitted under cover of a number of emails his responses to the Respondent's request for additional information (the "**Further Information**").[5]

55. On 17 October 2014 the Minister of Education wrote to the Claimant advising:

> *"(…)*
>
> *I have considered your application and I am not satisfied that your application meets the requirements of section 14(1)(a) and 14(1)(b) of the [Education Act] and accordingly I am giving you notice pursuant to section 14(2) and 14(4) of the [Education Act] that your application is refused.*
>
> *This decision is final and no correspondence will be entered into".[6]*

56. The Claimant alleged that the manner in which the Respondent considered the Initial Application and the Further Information was in breach of its

---

[3] B1/4.
[4] B1/7.
[5] B2/8 (it should be noted that neither Party was able to produce the emails and there was uncertainty as to whether the documents in B8 comprised the totality of the information and documentation submitted by the Claimant.
[6] B2/9.

obligations pursuant to clause 3 of the Settlement Agreement and commenced these arbitration proceedings against the Respondent.

57. Pursuant to an evidentiary hearing which took place in London between 17 – 19 December 2018, on 4 April 2019 the Tribunal issued its Partial Award on Liability, the relevant findings being as follows:

> *"167. Based on the above analysis, the Tribunal summarises its findings below and states:*
>
> *By a majority, the Tribunal finds that the Claimant's claim that the Respondent did not advise him clearly and distinctly of what was needed to obtain approvals to operate SCMI in breach of its obligation in clause 3 is upheld in the respects identified in paragraph 148 above;*
>
> *All other claims brought by the Claimant are denied.*
>
> *……….*
>
> *168. As detailed in paragraph 36 above, the Parties agreed that the proceedings would be bifurcated, with the first phase resulting in a Partial Final Award dealing with all issues other than damages (being findings of liability)[7] and for damages to be addressed in a second phase leading to a Final Award if liability were determined against the Respondent in the first phase.*
>
> *169. Given our determination (by a majority) that the Respondent is in breach of clause 3 of the Settlement Agreement, we now turn to the next phase of the proceedings. We have found that issues of causation (including the question of curability discussed at paragraphs 135-140 above) did not fall to be determined in this first phase of the arbitration and it was accepted by the Respondent that pursuant to the provisions of Procedural Order 1, issues of causation relating to damages did not form a part of the first phase of the arbitration.[8] Further, in considering whether the Respondent is in breach of the Settlement Agreement, we have not made any findings as to curability. We have not yet been addressed as to the applicable legal principles under Cook Islands law in relation to these issues.*
>
> *170. Whilst Procedural Order 1 envisages that there will only be two phases, with the second phase consisting of all issues of causation as well as the quantum of damages, if any, we are mindful of our obligations under ICC Article 22(1) to ensure this arbitration is conducted in an expeditious and cost-effective manner.*

---

[7] Procedural Order 1, A/2B para 1.
[8] T1/142:5-8.

*171.  The question of what the Claimant would have done had the Respondent complied with its obligations under clause 3 of the Settlement Agreement is clearly central to the question of whether any damages flow from the Respondent's breach. As noted by Mr Phillips, the quality of the advice given by the Respondent and what would have happened had the Respondent provided compliant advice are separate questions and we were not provided with the necessary evidence from the experts to determine this second question (the "**Causation Issue**").[9] However, the Causation Issue appears to us to be a discrete and concise issue which can and, given our obligations to minimise cost, should be determined first as, depending upon our determination, it may render redundant any hearing on quantum. Whilst we accept that, in the event the Claimant succeeds in proving causation, such further bifurcation could give rise to some delay in reaching our final determination on quantum, no specific issues of urgency were raised by either Party and it does not seem to us that it would be a particularly time consuming or costly exercise to obtain the necessary fact or expert evidence in respect of the Causation Issue. Accordingly, we are of the view that the appropriate way to proceed is for there to be a further bifurcated hearing limited to the Causation Issue and not including issues of quantum (the "**Causation Issue Hearing**"). At this Causation Issue Hearing we will first determine the legal principles applicable to the question of causation under Cook Islands law. We will then apply those principles to determine whether and, if so to what extent, the breaches of clause 3 found in paragraph 0) above caused the Claimant not to be able to open (or reopen) SCMI in the Cook Islands.*

*172.  The Parties have leave to apply to adduce further evidence of fact or law should they wish to do so; however, we note our understanding that most of the evidence on causation is already before us and we therefore anticipate that the Causation Issue Hearing will be relatively short."*

## G.    THE PARTIES' CASES

58.    It is common ground that to succeed in his claim, Dr Hubbart must satisfy the following five separate and cumulative requirements:

- that he would have sought accreditation in New Zealand ("Requirement 1");

---

[9] T4/4:7-12.

- that he would have submitted an application capable of being approved by the New Zealand Authorities ("Requirement 2");

- that the New Zealand Authorities would have accredited St Mary's programmes ("**Requirement 3**");

- that the Claimant would have reapplied to register SMCI in the Cook Islands ("**Requirement 4**"); and

- that the Claimant's application to the Cook Islands would have been successful ("**Requirement 5**").[10]

*Claimant's Case*

59.    The Claimant says that the Tribunal's task is "*to assess the evidence as a whole in order to determine whether or not Dr Hubbart has established, on the balance of probabilities, that he would have put himself in a position to re-establish [SMCI] and, if so, whether his chance of doing so was more than speculative.*"[11]  Central to this issue is whether Dr Hubbart "*could or would have obtained external accreditation*."  Dr Hubbart says that he knew he had to obtain such external accreditation and further knew that he could not obtain this without first registering his school somewhere but believed he was entitled to obtain all necessary approvals from the Respondent.  He now accepts this belief was incorrect, but he says he was entitled to be disabused of this incorrect belief by the Respondent.  Dr Hubbart therefore says his oral testimony in the Liability Hearing is of limited benefit as it was predicated on his wrongful belief as to the legal rights he thought the settlement agreement gave him.  Dr Hubbart says that had the Respondent properly complied with its contractual obligations, he would have sought advice from his lawyers "*in a different set of circumstances entirely.*"[12]

60.    If the correct position had been explained to him, Dr Hubbart says he would have sought legal advice which advice, he says, he would have followed.[13] He would have instructed Mr Gaston who would have advised him to seek advice from Mr Russell of the law firm ChenPalmer Partners.[14]  Mr Russell's evidence is that he would have ensured Dr Hubbart understood that the Claimant was entitled to require him to obtain external accreditation before reapplying to the Cook Islands for registration.  Mr Russell further testifies

---

[10] Upton 3 and Weston memorandum.
[11] C PHB para 1.
[12] C PHB para 10.
[13] Hubbart 3, para 10.
[14] Hubbart 3, para 12.

that he would have referred the Claimant to Ms Matthews, an education law specialist in the same law firm.[15]

61.   Ms Matthews says she would have advised Dr Hubbart to submit his application to New Zealand and would then have assisted Dr Hubbart in the process, thus ensuring the success of his application.  In her testimony she says that *"…I consider that I would have provided the same advice to Dr Hubbart had he been afforded the same opportunity to seek registration of a PTE in New Zealand.  The precise nature of that advice would have depended on the circumstances; however, it would have included the need to prepare a completely new application that conformed to NZQA's requirements.  I would certainly have advised against the submission of the Cook Islands application for the purposes of registering a PTE in New Zealand…..it is my opinion that, consistent with my Expert Report, Dr Hubbart would likely have succeeded had he followed my advice and submitted an application that complied with NZQA's requirements."*[16]

62.   Dr Hubbart says he would have followed the legal advice given to him and thus the question for the Tribunal is *"would [Dr Hubbart] have accepted the advice to first attain external accreditation in another jurisdiction before re-applying for registration in the Cook Islands.  Could he have done what he needed to do?"*[17]

63.   Dr Hubbart says Mr Sherwin's testimony is *"clearly and fundamentally flawed"* being wrongly premised upon Dr Hubbart re-submitting his application unchanged and failing to make further resources available.  Dr Hubbart says he would have submitted a new application, pursuant to Ms Mathews' advice.  With respect to the question of necessary funding, Dr Hubbart says he had access to seed capital (as stated in the evidence supporting his application to register in the Cook Islands) and, if this was insufficient, he had a number of funding options which he had a substantial chance of obtaining.  Whilst he is unable at this point to state precisely the sums necessary to establish SMCI, Dr Hubbart says *"I also had the option of seeking other investors, and was actively pursuing this in case it was needed.  I could have realised more assets and dedicated more funds of my own, if need be.  If I needed funding in addition to my own resources to get up and running, I would have found it.  As it was, my personal wealth in US Dollars gave me significant purchasing power against the NZ Dollar, which is used in the Cook Islands as well as New Zealand.  I easily had access to well*

---

[15] Russell 1, para 16.
[16] Matthews 2,paras 34-37.
[17] C PHB para 17.

*over one million New Zealand dollars, and could have raised more if it was needed.*"[18]

64.     Ms Matthews' testimony is that "*...Had Dr Hubbart had the opportunity to seek advice on establishing a PTE in New Zealand, there is no indication that he would have been unable to secure more funding.  It follows that Mr Sherwin's opinion that the 'Claimant's financial resources are woefully inadequate' proceeds from the misapprehension that the Cook Islands application represented the greatest extent of the Claimant's financial resources.  Accordingly, it is entirely possible and realistic that, had the Claimant been provided with the opportunity to register a PTE in New Zealand, he would have taken the opportunity to reassess his financial commitment according to circumstances as he found them to be.  Certainly I would have advised Dr Hubbart to ensure that he had the financial resources necessary to establish and maintain a PTE in New Zealand.*"[19]

65.     With respect to the criticism made by Mr Sherwin that the proposed PTE would be too small to achieve registration, Ms Matthews says that "*the advice given to Dr Hubbart would have been that the proposed roll of the PTE be large enough to achieve its purpose and that the initial finding reflect this.  There is no requirement that a PTE emerge in its final form to achieve registration: there is no reason why a PTE cannot expand further at a later stage.  My advice to Dr Hubbart would have been to pace any envisaged expansion.  ....My advice would have been to ensure that the initial set up was sufficient to satisfy the stakeholder communities and other regulatory requirements.*"[20]  Further, she says that Mr Sherwin is wrong to compare state owned universities with private tertiary education and just because no one is currently establishing a private medical school in New Zealand doesn't mean it cannot be done.  Indeed, Dr Hubbart contends that Mr Sherwin implicitly accepts that Dr Hubbart could do what Ms Matthews would have advised.

66.     Dr Hubbart further says it is clear from paragraph 9 of Mr Owen Lewis' second witness statement (filed in the Liability Hearing) that a medical and nursing school offering externally accredited qualifications in the Cook Islands would have met a need in the Cook Islands.  In this regard, Ms Matthews says that there would have been a community or stakeholder need as a "*PTE that trains medical professionals is clearly required – a matter that sits apart from the fact that, at present, all providers of medical and nursing training in New Zealand are public institutions and the Claimant's plans to have Saint Mary's primarily based in the Cook Islands.  The requirements for registration as a PTE are that the institution meets an*

---
[18] Hubbart 3, paras 18-19.
[19] Matthews 2, paras 25–26.
[20] Matthews 2, paras 31-32.

*identified need.  If it does, the fact that it also delivers courses offshore is
irrelevant.  In this instance, it is worth noting that there is a clear need for
more Doctors and nurses in rural New Zealand, especially in rural
practice.*"[21]

67.    Dr Hubbart then says that if he could not have achieved accreditation in
New Zealand, he would have pursued "*one of the other options he has
identified*"[22] namely he would have worked with Ms Milica Popovic[23] to
obtain accreditation elsewhere, for example in the Netherlands Antilles
(Aruba, Sint Maarten), St. Kitts and Nevis, Dominica, Barbados, Cayman
Islands or St. Vincent & the Grenadines.  This, Dr Hubbart says, would have
enabled him to attain globally recognised accreditation in order to re-apply
for registration in the Cook Islands.[24]

68.    Whilst he accepts that his case is not perfect, Dr Hubbart says that "*no
hypothetical scenario can be.  It is impossible to recreate a historical theory
with perfection.*"[25]  Dr Hubbart concludes however that he "*was willing to
do whatever* [he] *had to do to get S.M.C.I up and running.  The fact that* [he]
*first issued litigation proceedings against the Cook Islands in Washington
DC, USA, entered into the Settlement Agreement, and then issued these
arbitration proceedings surely shows both the strength of* [his] *convictions
and* [his] *ability to follow legal advice.*"[26]

69.    Dr Hubbart then notes that it is common ground between the experts on
Cook Island law that he "*must establish on the balance of probabilities that
he would have put himself in a position to enjoy the benefit of his chance*",[27]
by making the necessary arrangements to apply for external accreditation
(including finding additional funding if we determine that such was
required) and to the subsequent application for registration in the Cook
islands.  Having satisfied us on these grounds, Dr Hubbart must establish
that he had a real or substantial chance (as opposed to a speculative
chance) of being granted external accreditation, obtaining funding, and
successfully obtaining registration from the Respondent.[28]

70.    In conclusion, Dr Hubbart says that he would have: (i) taken advice from Mr
Gaston; (ii) taken advice from Mr Russell; (iii) worked with Ms Matthews to
attain accreditation in New Zealand, or alternatively with another expert

---

[21] Matthews 2, para 33.
[22] Hubbart 3, para 9.
[23] Ms Popovic provided expert testimony on behalf of the Claimant with respect to Quality Assurance in
Tertiary Education in the Partial Hearing on Liability.
[24] Hubbart 3, para 9.
[25] C PHB, para 37.
[26] Hubbart 3, para 22.
[27] *Allied Maples Group Limited v Simmons & Simmons* ("**Allied Maples**") [1995] 4 All ER 907
[28] *Allied Maples*, para 919 b and d.

such as Ms Popovic to attain accreditation elsewhere; (iv) returned to apply
to the Cook Islands with external accreditation, which application would
have been substantially different and which would have met a need; and (v)
had he obtained external accreditation, he says his chance of re-
establishing SMCI would have been "*very high*".[29]  To suggest that Dr
Hubbart would not have put himself in the position to obtain accreditation
or to suggest his chances of re-establishing SMCI is wrong and ignores his
"*dogged determination*" to re-establish SMCI as demonstrated by: (i) his
attempts to negotiate with the Respondent; (ii) his commencing
proceedings against the Respondent in Washington; (iii) entering into the
Settlement Agreement; and (iv) seeking legal advice from Mr Gaston and
Mr Russell.[30]

71.    The Respondent's failure to explain to Dr Hubbart how to cure the deficiencies in
his application therefore led to the loss of his chance to succeed in his endeavour
of opening SMCI leading to loss on his part.

*Respondent's Case*

72.    The Respondent first refers to the Partial Award on Liability and notes that
the only question for the Tribunal to decide in this hearing on causation is
"*whether and, if so to what extent, the breaches of clause 3…caused the
Claimant not to be able to open (or reopen) [SMCI].*"[31]  The Respondent says
that Dr Hubbart has "*utterly failed to carry his burden to prove that
Respondent's breach of duty to 'clearly and distinctly' inform him of the
importance of external accreditation caused him to lose the chance to
register* [SMCI]."[32]

73.    The Respondent then turns to the five separate and cumulative
requirements that the Claimant must satisfy.

*Requirement 1:*

74.    Firstly, to prove that his own actions would have been such as to place
himself in a position to obtain external accreditation, Dr Hubbart must
prove that it is more likely than not that, had he been more explicitly
informed of the external accreditation requirement, he would have sought
to register his medical school and obtain external accreditation in New
Zealand.  In this regard, the Respondent notes that in his earlier testimony
in the liability phase of this arbitration, Dr Hubbart had taken a

---

[29] C PHB paras 41-42.
[30] C PHB paras 33-36.
[31] Respondent's Outline for Closing Submissions on Causation, para B1.
[32] R PHB para 1.

diametrically opposite view "*emphatically and categorically reject*[ing] *any suggestion that he should have, or could have, sought external accreditation in New Zealand (or anywhere else) before opening [SMCI] in the Cook Islands*." Indeed, the Respondent notes that whilst Dr Hubbart had been aware ever since his first application had been rejected that the Respondent required evidence of external accreditation, "*the Claimant has failed to explain why an additional statement from the Respondent reiterating the external accreditation requirement (of which Claimant was already aware) suddenly would have prompted Claimant to seek and follow additional advice from Mr Russell.*" Indeed, it was not until receipt of the Partial Award on Liability that the Claimant sought advice as to whether the Respondent's actions were lawful.[33]

75. The Respondent refers to Dr Hubbart's evidence in the Liability Hearing when he described the idea of operating institutions in two different jurisdictions as "*insanity*" as it would defeat the purpose of opening a school in the Cook Islands.[34] The Respondent contrasts this with Dr Hubbart's evidence in the Causation Hearing that he would have been "*excited*" at the prospect of establishing New Zealand's first-ever private medical and nursing school and contends that Dr Hubbart's latest position is "*patently disingenuous*".[35] Given Dr Hubbart knew ever since he submitted his Cook Islands application that proof of external accreditation was required and yet took no steps to obtain this or even to obtain legal advice as to whether such a requirement was lawful, any suggestion from Dr Hubbart that he would have acted differently had he been informed by the Respondent of what he already knew is "*illogical and lacks credibility*." Further given Dr Hubbart's repeated prior representations that he would not have attempted to seek external accreditation, his contention in the Causation Hearing that he would have done so is "*absurd on its face.*" As a self-described business man,[36] Dr Hubbart's purpose in opening SMCI in the Cook islands must have been to make a profit. To risk his life savings by opening the first-ever private medical school in New Zealand in order to develop a flagship Cook Islands campus is, the Respondent says, "*simply incredible*".[37]

76. Accordingly, the Respondent submits that Dr Hubbart has not proved that it is more likely than not that, had he been more explicitly informed of the external accreditation requirement, he would have sought to register his medical school and obtain external accreditation in New Zealand.

---

[33] R PHB paras 6-12.
[34] Liability Hearing T2/90:18-91:23 and T2/176:8-178:3.
[35] R PHB paras 8-9.
[36] C Memorial on Causation, para 341.
[37] R PHB para 14.

*Requirement 2*

77.    Secondly, Dr Hubbart must prove that it is more likely than not that he
       would have submitted applications for accreditation to the NZQA and
       Medical and Nursing Councils that were worthy of approval.  However the
       Respondent notes that Dr Hubbart has not identified any of the proposed
       content of his hypothetical application and has adduced *"no competent
       evidence to show that he could have satisfied the applicable requirements
       for the registration and accreditation of private tertiary institutions in New
       Zealand generally (and for medical and nursing schools more specifically).
       Indeed Claimant fails even to identify the requirements he would have had
       to satisfy to open a medical and nursing school in New Zealand (let alone,
       explain how he could have satisfied these unidentified requirements)."*  This
       is particularly so when there are no privately-operated medical schools in
       New Zealand from which to draw guidance.  In the absence of such
       evidence, the Respondent says that we are only left with the failed
       application for SMCI to the Respondent, but this is of no assistance in
       circumstances where Ms Matthews has testified that Dr Hubbart would
       have needed to prepare a completely new application which conformed to
       the NZQA's requirements as she would have advised against submitting the
       rejected Cook Islands application.  However, we have no guidance from Ms
       Matthews as to how the new application would have had to differ from the
       Cook Islands application.  Ms Matthews has not identified any specific
       advice she would have given the Claimant, noting it would be an *"entirely
       theoretical exercise due to the lack of instructions and supporting
       application material from Dr Hubbart."*[38]  Thus Ms Matthews' opinion is
       premised not on any tangible substantive evidence from the Claimant as to
       the intended content of his application to New Zealand but instead on Ms
       Matthews' previous success registering PTE programs in New Zealand,
       notwithstanding her acceptance that neither she nor anyone else has
       successfully assisted a PTE in accrediting a medical programme in New
       Zealand.  In this regard, the Respondent refers to the testimony of Mr
       Sherwin as to the overwhelming unlikelihood of the Claimant producing a
       successful application, even with competent assistance.[39]

78.    The Respondent notes that Dr Hubbart has not adduced any evidence to
       support either his contention that the New Zealand authorities would have
       entertained an application for a *"very small"* school or that he could have
       adequately funded such a school.[40]  With respect to the size of such a
       school, the only support is Ms Matthews' testimony that she is unaware of
       *"any minimum number of students a PTE [in New Zealand] is required to*

---

[38] Matthews 2, paras 12-13.
[39] R PHB para 15.
[40] Hubbart 3, para 18; R PHB para 19.

*have within the first year.*"[41]  In response to this, however Mr Sherwin notes that as the New Zealand Qualifications Act provides standards against which to assess all PTE programmes, "[i]*t would be inappropriate to specify a single, minimum number of students across all programmes.*"[42]  Mr Sherwin notes that Dr Hubbart does not specify the number of students he intends to enroll but given firstly that Dr Hubbart's intention in the Cook Islands was to enrol 30–50 students in each of the undergraduate and graduate degree programmes and secondly Dr Hubbart's reference to setting up a "*very small school*" in New Zealand,[43] Mr Sherwin estimates that Dr Hubbart can only have been anticipating enrolling in the region of "*some small fraction*" of the number of students to be enrolled in the Cook Islands.  In Mr Sherwin's opinion, "*any medical or nursing school of that size would lack the capacity to be taken seriously by the NZQA.*"[44]  The Respondent notes that in her response Ms Matthews did not make any comment as to the necessary number of students, merely noting that she would have advised Dr Hubbart to ensure the proposed roll be large enough to achieve its purpose.

79.   Mr Sherwin further says that one million New Zealand Dollars "*would be seriously insufficient to fund either a medical or nursing programme, let alone both.*"[45]  The Respondent notes that no evidence was adduced by Dr Hubbart as to the likely quantum of funding required, Ms Matthews testimony being again limited to her statement that she "*would have advised Dr Hubbart to ensure that he had the financial resources necessary [to] establish and maintain a PTE in New Zealand*".

80.   The Respondent says that Dr Hubbart's lack of resources would have doomed any hypothetical application to open his school in New Zealand. Mr Sherwin concludes that it is "*highly improbable*" that Dr Hubbart could have cured the deficiencies inherent in his Cook Islands application in respect of at least three separate NZQA criteria as his "*financial resources are woefully inadequate to : (i) create a satisfactory business plan to deliver an educational programme in the highly regulated medical and nursing professions; (ii) secure the staff, equipment and premises necessary to run a medical or nursing school; and (iii) demonstrate acceptable financial management practices and performance.*"  Further, Mr Sherwin concludes it is "*improbable*" that Dr Hubbart could have satisfied two further criteria, namely: (i) the creation of quality management system policies and procedures that honestly reflected the complex operational requirement of a medical school; and (ii) becoming a signatory to the Code of Practice for

---

[41] Matthews 1, para 23.
[42] Sherwin 2, para 27.
[43] Hubbart 3, para 16.
[44] Sherwin 2, para 26.
[45] Sherwin 2, para 29.

the Pastoral Code of International Students which requires an approved programme of study.

81.  Mr Sherwin says that it is *"extremely unlikely"* that Dr Hubbart's plan to use a New Zealand medical school outpost in service of a flagship campus in another country would ever satisfy a need in New Zealand.  In this regard, Mr Sherwin concludes that the NZQA would find that this *"arrangement poses an unacceptably high risk while failing to meet community or stakeholder needs."*[46]

82.  The Respondent notes that Ms Matthews did not address this in substance, merely noting that she would again have advised Dr Hubbart to ensure his new application met NZQA standards and declining to identify the substance of any new application on the basis that *"[i]t is not useful to speculate on the precise steps I would have advised the Claimant to take as that advice would have depended on the exact facts at the time the Claimant would have approached me for advice."*[47]

83.  The Respondent finally notes that Ms Matthews merely referred to the requirement to obtain approval from the Medical and Nursing Councils without addressing substantively how she would have advised Dr Hubbart to obtain such approval.  In this regard, the Respondent refers to Mr Sherwin's testimony (which it notes was uncontested), that to attain accreditation, Dr Hubbart would have had *"to obtain the written agreement of at least one medical facility in New Zealand with the capacity and scope to provide clinical placements."*[48]  The Respondent notes that there is no evidence adduced by Dr Hubbart as to how this requirement would have been met.

84.  Given it is common ground that the Cook Islands application would not have sufficed and in the absence of any evidence as to what Dr Hubbart's application to the NZQA would have consisted of, the Respondent contends that there was no real or substantial chance that the New Zealand authorities would have registered Dr Hubbart's medical school and accredited its programmes.  The Respondent therefore submits that Dr Hubbart has not proven that it is more likely than not that he would have submitted applications for accreditation to the NZQA and Medical and Nursing Councils that were worthy of approval.

*Requirement 3*

---

[46] Sherwin 2, paras 23-24.
[47] Matthews 2, para 15.
[48] Sherwin 2, para 39.

85.     Thirdly, Dr Hubbart must prove that there was a real or substantial chance that the New Zealand authorities would have registered his medical school and accredited its programmes.  In circumstances where Dr Hubbart has failed to show that any hypothetical application he may have submitted to the New Zealand authorities was capable of being approved, the Respondent contends that Dr Hubbart has not shown that he stood a "*real or substantial*" chance of having any such application actually approved by either the NZQA or the Medical and Nursing Councils.  The Respondent thus asserts that Dr Hubbart's case rests on his existing application to the Cook Islands which both experts agree had no prospect of being approved.

86.     Accordingly, Dr Hubbart has failed to prove that there was a realistic chance that the New Zealand authorities would have accredited the St Mary's programmes.

*Requirement 4*

*Requirement 5*

87.     Fourthly, Dr Hubbart must prove that it is more likely than not that, after obtaining accreditation in New Zealand, he would have taken all reasonable steps to register SMCI in the Cook Islands and demonstrated that he satisfied a need in the Cook Islands and fifthly, that there was a real or substantial chance that the Cook Islands would have granted him the registration.

88.     The Respondent first notes that Dr Hubbart has not demonstrated that he would have obtained approval for offshore delivery of services from New Zealand.  Mr Sherwin has testified that he is not aware of any similar arrangement and his conclusion that it is "*highly improbable*" that this proposal "*would have reached the point of even being considered by the NZQA for offshore delivery*"[49] was not disputed by Ms Matthews.

89.     The Respondent next notes the inconsistency in Dr Hubbart's evidence, referring to his earlier testimony that it would be "*insanity*" to operate two St Mary's campuses in two separate jurisdictions and contends that his subsequent testimony that in fact he would have opened a second campus in the Cook Islands is "*not credible*".[50]  Finally, the Respondent notes Dr Hubbart's consistent failure to identify any need that his proposed medical programme would have served in the Cook Islands.

---

[49] Sherwin 2, para 36.
[50] R PHB para 31.

90.   Accordingly, the Respondent says that Dr Hubbart has failed to satisfy the fourth and fifth requirements to establish causation such that his claim must fail.

## H.   THE TRIBUNAL'S ANALYSIS

91.   It is common ground that whilst there is no Cook Islands case law as to the appropriate legal standard for causation and loss of a chance, a Cook Islands court would approach this question based on New Zealand and English and Welsh precedent, particularly as these approaches are the same and there is no particular local policy or other reason not to follow them.  A Cook Islands court would therefore follow the approach laid done in *Allied Maples* as subsequently adopted by the New Zealand Court of Appeal in *Benton v Miller & Poulgrain*.[51]  Following these cases, the correct approach under Cook Islands law is firstly to determine whether, on the balance of probability, Dr Hubbart would have taken the necessary steps required to obtain the external accreditation for SMCI.  If Dr Hubbart is able to prove this, there is no discount if the balance is only just tipped in his favour. Secondly, Dr Hubbart must prove that he had a real or substantial rather than a speculative chance of gaining this foreign accreditation.  This by necessity entails showing that any application submitted by him would have been capable of being approved by the New Zealand authorities.  Thirdly, Dr Hubbart must show on a balance of probabilities that he would have taken all reasonable steps to demonstrate that SMCI satisfied a need in the Cook Islands and finally Dr Hubbart must show that he had a real or substantial chance rather than a speculative one of his application being approved by the Cook Islands authorities.  It has been accepted by the Parties that in accordance with Allied Maples the Tribunal will need to apply different tests to different issues and indeed that some of the issues may break into sub-issues which themselves may require different approaches.[52]

92.   The following steps therefore need to be determined:

(i)   Requirement 1 - had Dr Hubbart been properly advised about the need for external accreditation by the Respondent at the time of rejection of his application in accordance with the Settlement Agreement, would he have decided to apply to set up a medical/nursing facility in New Zealand in order to obtain the necessary stepping-stone approval;

---

[51] [2005] 1 NZLR 66.
[52] Upton 3 and Weston Memorandum.

(ii)     Requirement 2 - whether Dr Hubbard would have been able to mount the necessary applications such that they were capable of acceptance by the NZQA and the two relevant professional bodies;

(iii)     Requirement 3 - whether the NZQA and the two relevant professional bodies would have given the necessary approvals;

(iv)     Requirement 4 - whether Dr Hubbart would then have proceeded to make his applications in the Cook Islands on behalf of an institution which now had the benefit of external accreditation; and

(v)     Requirement 5 - whether the relevant Cook Islands authorities would have given the relevant permissions and allowed the establishment of the Cook Islands nursing and medical schools to proceed (thereby enabling him to earn the profits which are the damages claimed in this case).

93.     In the event this Partial Award will be limited to considering Requirements 1 and 2 as analysed above. This is because we do not consider that Dr Hubbart has made out his case in respect of either of those steps to the relevant standard or indeed at all. The evidence before us was, in our considered view, to the contrary. Failure to establish either one of them is of course fatal to the claim, as is accepted by both Parties.

### I.     Requirement 1

94.     It is not disputed that Dr Hubbart consulted lawyers after receiving the letter of rejection. Dr Hubbart was in particular advised by Mr Russell of ChenPalmer Partners who wrote to the Cook Islands on his behalf raising a number of issues that ultimately came before us for decision, including an alleged failure to give clear and distinct advice and the apparent failure to consult Dr Hubbard before answering enquiries from third parties (see our Partial Award on Liability).

95.     Dr Hubbart's core causation case here asserts that had the Respondent complied with the Settlement Agreement and given clear and distinct advice about the need to seek external accreditation, Mr Russell would have confirmed that statement from the Respondent as legally correct and Dr Hubbart in turn would have complied with Mr Russell's ensuing recommendation to engage Ms Matthews who would have advised him to seek accreditation in New Zealand. Dr Hubbart would have followed this advice and would further have retained Ms Matthews to assist him in making the application to obtain external accreditation in New Zealand.

96.     The critical question relates to the hypothetical decision that Dr Hubbart
        would have taken, a matter we have to assess on the balance of
        probabilities pursuant to *Allied Maples*.  We do not find that it is established
        on a balance of probabilities that he would have taken the decision to apply
        in New Zealand for the following reasons:

   (i)      Dr Hubbart records in his first witness statement that even when he
            saw the reference to external accreditation in the Cook Islands
            application form, he regarded the requirement as illegitimate.  From
            the beginning of these arbitration proceedings (when he served the
            Request for Arbitration on the Respondent), Dr Hubbart's primary
            case was that the imposition of this requirement for external
            accreditation was of itself a breach both of the Settlement Agreement
            and of Cook Islands law.[53]  Given the content of the Request for
            Arbitration, the only conclusion that can be drawn is that, by the
            time it was served on the Respondent, Dr Hubbart must have
            received Cook Islands law advice from somewhere that this
            requirement was unlawful.  However forceful Mr Russell's advice
            might have been to the contrary, we find it more than hard to accept
            that Dr Hubbart would have meekly submitted to Mr Russell's
            recommendation to seek external accreditation at any relevant stage
            and it is more likely that he would not have done so.

   (ii)     Dr Hubbart's case at this Causation Hearing was that he did not
            realise that he had to apply for external accreditation (and so took no
            steps as to the same) until after he received the Partial Award on
            Liability.  We do not find this to be plausible.  Firstly, this is
            contrary to Dr Hubbart's evidence at the Liability Hearing that he
            realised that the need for some accreditation was the first ground for
            the Respondent's refusal of his application.  Secondly, Dr Hubbart
            nonetheless took no steps as regards applying for external
            registration and even now, has done no more than obtain basic and
            limited advice as to the need, means and criteria for doing so.
            Thirdly, Dr Hubbart claims that to proceed further would be
            "*speculative*" and disproportionately expensive, instead taking the
            decision to focus his time and resources on his proceedings against
            the Respondent in which he claims US$20 million.

   (iii)    It is impossible to ignore the strength of Dr Hubbart's reaction when
            cross-examined at the Liability Hearing to the suggestion that he
            could or should have sought accreditation elsewhere.  He variously
            described such a course of action as "*insanity*" and "*impossible*".[54]

   (iv)     The two breaches which were ultimately held to be established in our
            Partial Award on Liability were significantly outnumbered by a
            number of other complaints which were pursued further in the early
            correspondence and ultimately in the proceedings before us.  Dr

---

[53] Request for Arbitration.
[54] T2/90:18-91:23; T2/176:8-178:3.

Hubbart felt at least equally strongly about those.  This also makes it less likely in our view that he would have applied his energies and his resources to New Zealand accreditation rather than to the continued pursuit of his claims and ultimately the arbitration.

97.     Given the above, we find that it is impossible to avoid the conclusion that Dr Hubbart's evidence now as to what he would have done but for the breaches of contract is inspired by the need to find a case on causation that fits the breach.

## II.     Requirement 2

98.     Dr Hubbart's case here again relies upon his interaction with the New Zealand legal profession.  He says that Mr Russell would have referred him to a lawyer such as Ms. Matthews and with the benefit of that lawyer's guidance and advice he would have been able to present a viable application to the New Zealand authorities.  Ms. Matthews gave evidence before us by video link.

99.     Taking into account all the evidence before us, we think that it is extremely unlikely that such an application was capable of being mounted by Dr Hubbart for the following reasons:

(i)     While we would not have expected Dr Hubbart to put before us a fully detailed application, we have been asked to allow this claim in circumstances in which the proposal remains wholly vague as to, for example, scope, costing, and resources;

(ii)    Ms. Matthews was effectively confined to stating that, provided Dr Hubbart followed her advice and complied with the NZQA requirements, then his application would be acceptable. This evidence is wholly colourless;

(iii)   Dr Hubbart gives evidence in his most recent statement[55] that having come to accept since our award that external accreditation was a legitimate requirement, he would now be launching an application in New Zealand except that the cost of the arbitration has left him with inadequate resources.  This evidence is almost impossible to evaluate given that Dr Hubbart has been vague and inconsistent as to both the likely budget for this scheme and as to the sources of finance that might have been available to him;

(iv)    Dr Hubbart and Ms Matthews have not provided compelling, or indeed any, answers to the deficiencies identified by Mr Sherwin with respect to Dr Hubbart's proposed application to New Zealand for accreditation for his medical and nursing programme.  Indeed as

---

[55] Hubbart 3, para 23.

ICC Arbitration – 23261/TO
Partial Award on Causation

was clear from Ms Matthews' testimony, no detailed consideration has to date been given by Dr Hubbart as to the substance of any application to the New Zealand authorities, Ms Matthews' testimony being limited to the statement that: *"The precise nature of that advice would have depended on the circumstances; however, it would have included the need to prepare a completely new application that conformed to NZQA's requirements. I would certainly have advised against the submission of the Cook Islands application for the purposes of registering a PTE in New Zealand.....it is my opinion that, consistent with my Expert Report, Dr Hubbart would likely have succeeded had he followed my advice and submitted an application that complied with NZQA's requirements."* The suggestion that Dr Hubbart could start a small school as a *"pathfinder"* seems implausible. We find Mr Sherwin's evidence that the New Zealand authorities would be unimpressed by a school established principally as a stalking horse for a subsequent Cook Islands foundation to be wholly convincing. We were reminded that this would be the first private medical training facility established in New Zealand ever and indeed the first new medical school of any kind for many decades. We also accept Mr Sherwin's evidence that the New Zealand authorities would be unlikely to be impressed with an application for a small number of students.

(v)    The only concrete indication of the likely quality of the application which Dr Hubbart would have been prepared to submit is the application he made in the Cook Islands which we examined in detail at the first hearing. Tellingly Ms Matthews was absolutely clear that he should not resubmit that application as it would have no prospect of success.

(vi) Although it has not been a decisive factor in our reasoning we do take into account the application for a new medical school at Waikato which we have seen. The document is 44 pages long[56], detailed and highly impressive. It is able to point out for example that the medical school would be able to operate within the existing infrastructure of an established university with all the obvious advantages that that would bring. That was not an advantage that Dr Hubbart could claim. The Waikato application did not go ahead for reasons that do not concern us. However, we find it wholly impossible to imagine that Dr Hubbard could have resourced, funded and compiled an application of anything like that quality even with the undoubted benefit of Ms Matthews' help.

100.    We find on the balance of probabilities that Dr Hubbart would not have made a viable application to the relevant New Zealand authorities. Mr Iorns suggested the availability of funders to back the project might be a separate issue to be assessed to a different standard. We agree. To the

---

[56] E3, tab 39. In addition to the 44 pages provided to us, we note that Section 1, appendices 1 – 7 and sections 2 – 6 of this document were redacted.

extent that it is a separate question relating to the decisions of third parties we find that the evidence does not even establish a speculative chance of Dr Hubbart being able to raise the financial backing necessary to make such an application.

### III.      Requirements 3, 4 and 5

101.   In the circumstances and Dr Hubbart's having failed to establish either of the first two links in the chain of causation it is unnecessary for us to consider Requirements 3, 4 and 5.

### IV.      The alternative jurisdictions

102.   Dr Hubbart ran a fall-back case that even if he could not establish facilities in New Zealand, he would have been able to appeal to other sources of external accreditation, naming six other jurisdictions.  Any of these it was argued could have accredited the nursing and medical facilities and provided the necessary platform for the ultimate application to the Cook Islands.

103.   We do not think that the Claimant has come close to establishing this alternative causation theory.

104.   While we have relatively little material as to how he would have set about establishing or accrediting the New Zealand facility, we have none at all in relation to the six alternative jurisdictions beyond sight of their regulatory codes.  We certainly have no expert evidence about them at all.

105.   The Cook Islands' close connection with and evident respect for New Zealand and their ready adoption of NZQA standards has been a striking theme of this case.  If it were possible to obtain it there, New Zealand would be the obvious source of the necessary external accreditation.  Given the specific evidence about Mr Russell's role in the counter-factual we are unclear as to the scenario in which Dr Hubbart would have gone instead to any of the six alternative jurisdictions.  Would he fail first to get registration in New Zealand and then go to one of these?  We simply do not know.

106.   We therefore find that:

    (i)      had Dr Hubbart been properly advised about the need for external accreditation by the Respondent at the time of rejection of his application in accordance with the Settlement Agreement, he would not have decided to apply to set up a medical/nursing facility in New

Zealand in order to obtain the necessary stepping-stone approval; and

(ii) Dr Hubbart would not have been able to mount the necessary applications such that they were capable of acceptance by the NZQA and the two relevant professional bodies.

(iii) Accordingly, as Dr Hubbart has failed to establish either of the first two links in the chain of causation, it is unnecessary for us to consider the further three requirements to found causation.

(iv) Finally, Dr Hubbart has not discharged his evidential burden that he would successfully have obtained external accreditation from an alternative jurisdiction had he been unable to establish or obtain accreditation in New Zealand.

107.   Accordingly, we do not find that Dr Hubbart has succeeded in proving to the necessary standard that the breaches of clause 3 of the Settlement Agreement determined in our Partial Award on Liability caused Dr Hubbart not to be able to open (or reopen) SMCI in the Cook Islands.

## I.   COSTS

108.   The Tribunal makes no ruling as to costs in this Partial Award on Causation and all questions of costs are therefore reserved.

## J.   DISPOSITIVE

109.   For the reasons set out above, the Tribunal, having heard all the evidence and submissions of the Parties, hereby DECLARES and ORDERS that:

a.   The breaches of clause 3 of the Settlement Agreement determined in our Partial Award on Liability did not cause Dr Hubbart not to be able to open (or reopen ) SMCI in the Cook Islands;

b.   The Claimant's claims are dismissed in their entirety; and

c.   The Arbitration and Legal Costs relating to the Partial Award on Liability and this Partial award on Causation are reserved.

ICC Arbitration – 23261/TO
Partial Award on Causation

Place of Arbitration:        London, United Kingdom

Date:        1 8        February 2020

Signatures:

**Mr William Wood QC**
Co-Arbitrator

**Mr Murray Rosen QC**
Co-Arbitrator

**Juliet Blanch**
Presiding Arbitrator

**30/30**

# EXHIBIT "D"

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 23261/TO/AZR

Dwane L. Hubbart

(U.S.A.)

**vs/**

THE GOVERNMENT OF THE COOK ISLANDS

(Cook Islands)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**IN THE MATTER OF AN ARBITRATION UNDER THE 2017 RULES OF ARBITRATION OF**

**THE INTERNATIONAL CHAMBER OF COMMERCE ("ICC")**

**INTERNATIONAL COURT OF ARBITRATION**


ICC ARBITRATION NO. 23261/TO/AZR


BETWEEN


**DWANE L. HUBBART**

("Claimant")

**v.**

**THE GOVERNMENT OF THE COOK ISLANDS**

("Respondent")

---

**FINAL AWARD ON COSTS**

---


BEFORE


**Mr William Wood QC** – Arbitrator
**Mr Murray Rosen QC** – Arbitrator
**Ms Juliet Blanch** – Presiding Arbitrator

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **A.** | **Parties** | **1** |
| **B.** | **Arbitral Tribunal** | **3** |
| **C.** | **Arbitration Agreement** | **4** |
| **D.** | **Procedural Background** | **5** |
| **E.** | **ApplicaBle Rules as to Costs** | **7** |
| **F.** | **Contractual Provision as to Costs** | **9** |
| **G.** | **Overview of the Respondent's Position** | **9** |
| **H.** | **Overview of the Claimant's Position** | **12** |
| **I.** | **The Tribunal's Determination** | **13** |
| | I.   Did the Respondent prevail? | 14 |
| | II.   Reasonability of the Respondent's Costs | 14 |
| | The Respondent's Conduct of the Case – October/November 2018 | 14 |
| | The Respondent's conduct of its Defence – the Liability Phase | 16 |
| | The quantum of the Respondent's fees | 17 |
| **J.** | **Interest** | **18** |
| **K.** | **Dispositive** | **18** |

## ICC Arbitration No. 23261/TO/AZR

1.   This arbitration concerns a claim arising under a Settlement Agreement dated 3 May 2013 signed by the Claimant and by the Respondent and the Ministry of Health of the Cook Islands (the "**Ministry of Health**") relating to the Claimant's application to reopen a Medical School in the Cook Islands (the "**Settlement Agreement**").[1]

**A.      PARTIES**

2.   The Claimant is Dwane L. Hubbart, a United States citizen residing in the State of Florida, U.S.A. ("**Dr. Hubbart**" or the "**Claimant**").

3.   The Claimant's contact details are as follows:

> **Dwane L. Hubbart**
> 20533 Biscayne Blvd # 1315
> Aventura
> 33180, Florida, U.S.A.
> Telephone:      + 1 305 934 5371
> Email:      dwanehubbart@aol.com

4.   The Claimant was represented in these proceedings until 30 April 2020 by:

> **Ms Amanda Lee**, Consultant
> Seymours
> 502-503 Davina House
> 137-149 Goswell Road
> London EC IV 7ET
> United Kingdom
> Telephone:      +44 20 8798 0150
> Email:      amanda.lee@seymourslaw.com [2]
>
> **Mr Stephen Iorns**
> 16 Ocean Parade
> Pukerua Bay
> Wellington 5026
> New Zealand
> Telephone:      +64 4 974 9121
> Email:      stephen@iornslegal.co.nz
>
> **Mr David Phillips QC**
> Wilberforce Chambers

---

[1] B1/2.
[2] Seymours did not participate in the submission of the Claimant's Submissions on Costs.

      8 New Square, Lincoln's Inn
      London WC2A 3QP
      United Kingdom
      Telephone:  +44 20 7236 2956
      Email:      dphillips@wilberforce.co.uk[3]

5.     After 30 April 2020, the Claimant was only represented by Mr Stephen Iorns.

6.     The Respondent is the Government of the Cook Islands, a sovereign state located in the South Pacific in free association with the state of New Zealand ("**Cook Islands**" or the "**Respondent**").

7.     The Respondent's contact details are as follows:

      **Ms Catherine Evans**, Crown Counsel
      Te Akinanga O Te Ture I Crown Law Office
      PO Box 494
      Avarua, Rarotonga
      Cook Islands
      Telephone:    +(682) 29337
      Email:     catherine.evans@cookislands.gov.ck

8.     The Respondent is represented in these proceedings by:

      **Mr Andreas Frischknecht**
      **Mr James Hosking**
      **Ms Erin Valentine**
      Chaffetz Lindsey LLP
      1700 Broadway 33rd Floor
      New York, NY 10019
      U.S.A.
      Telephone:   + 1 212 257 6960
      Email:   andreas.frischknecht@chaffetzlindsey.com
               james.hosking@chaffetzlindsey.com
               erin.valentine@chaffetzlindsey.com

9.     The Claimant and the Respondent are collectively referred to as the "**Parties**."

---

[3] Mr Phillips did not attend the Causation Hearing and did not participate in any communications with the Tribunal at any stage thereafter.

### B.      ARBITRAL TRIBUNAL

10.   The Claimant nominated Mr William Wood QC as its party-appointed arbitrator in these proceedings. Mr Wood's contact details are as follows:

> **Mr William Wood QC**
> Brick Court Chambers
> 7-8 Essex Street
> London WC2R 3LD
> United Kingdom
> Telephone:     +44 20 7379 3550
> Email:      william.wood@brickcourt.co.uk
> Clerk:      Ms Kate Trott (kate.trott@brickcourt.co.uk)

11.   The Respondent nominated Mr Murray Rosen QC as its party-appointed arbitrator. Mr Rosen's contact details are as follows:

> **Mr Murray Rosen QC**
> 4 New Square
> London WC2A 3RJ
> United Kingdom
> Telephone:     +44 20 7822 2000
> Email:      m.rosen@4newsquare.com
> Clerk:      Nick Angliss (n.angliss@4newsquare.com)

12.   The ICC Secretary General confirmed the nomination of Mr Wood and Mr Rosen as co-arbitrators in these proceedings on 30 January 2018.

13.   On 15 February 2018, pursuant to Article 13(4) of the ICC Rules, the International Court of Arbitration of the International Chamber of Commerce appointed Ms Juliet Blanch as the president of the arbitral tribunal. Ms Blanch's contact details are as follows:

> **Ms Juliet Blanch**
> Arbitration Chambers
> Lamb Building, 3rd Floor South
> Temple, London EC4Y 7AS
> United Kingdom
> Telephone:     +44 20 7167 2040
> Email:      juliet.blanch@arbitrationchambers.com

### C.    ARBITRATION AGREEMENT

14.    The arbitration agreement is found in Clause 13 of the Settlement Agreement dated 3 May 2013 (the "**Settlement Agreement**") between the Claimant, the Respondent and the Ministry of Health of the Cook Islands (the "**Ministry of Health**").

15.    Clause 13 of the Settlement Agreement provides as follows:

> *Arbitration and Waiver of Sovereign Immunity.*
>
> *Any dispute, controversy, or claim arising out of, relating to, or in connection with this Settlement Agreement, including with respect to the formation, applicability, breach. termination, validity or enforceability thereof, shall be finally settled by binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("Arbitration"). The tribunal shall consist of three arbitrators, one arbitrator appointed by each Party and the third, who shall be the President of the tribunal, appointed by the Court of Arbitration of the International Chamber of Commerce. The seat of Arbitration shall be London, England, and the proceedings shall be conducted in English.*
>
> *The Arbitration shall be final and binding on the Parties. The Parties undertake to carry out any award rendered in the Arbitration without delay. The Parties explicitly waive any right to refer any question of law and any right of appeal on the law and/or merits to any court.*
>
> *For the avoidance of doubt, and without regard to any provisions of Cook Islands law and without regard to paragraph 12 above, the Cook Islands Government Parties hereby irrevocably waive any claim to sovereign or any other immunity in regard to (i) participation on the Arbitration and (ii) proceedings before any competent court to enforce (a) the Arbitration agreement contained herein or (b) any Arbitration award rendered by a tribunal constituted pursuant to this Settlement Agreement.*

16.    The applicable law is found in clause 12 of the Settlement Agreement which provides as follows:

> *12. Choice of Law. This Settlement Agreement and all actions or proceedings arising directly or indirectly from this Settlement Agreement, shall be governed by Cook Islands law (without regard to conflict of law principles).*

17.    By clause 12 of the Settlement Agreement, the Parties have agreed that the applicable law is the law of the Cook Islands. By clause 13 of the Settlement

Agreement, the Parties have agreed that the seat of the arbitration is London, England and as a result of this choice the English Arbitration Act 1996 applies to these arbitration proceedings.

18. The rules governing these arbitration proceedings are the Rules of Arbitration of the International Chamber of Commerce, in force as from 1 March 2017 (the "**ICC Rules**").

## D.    PROCEDURAL BACKGROUND

19. This section is not intended to be an exhaustive summary of all of the correspondence between the Tribunal and the Parties but rather serves simply to summarise the procedural background of this arbitration to date, detailing the relevant events that occurred immediately before and after the issuance of the Tribunal's Partial Award on Causation to closing of the proceedings.  The procedural background contained in the Partial Award on Causation is incorporated by reference into this Final Award.

20. On 13 February 2020, the International Court of Arbitration of the ICC (the "**ICC Court**") extended the time limit for rendering the final award until 29 May 2020, pursuant to Article 31(2) of the ICC Rules.

21. On 18 February 2020, the Partial Award on Causation was notified to the Parties. This Partial Award on Causation determined that the Respondent's breaches of clause 3 of the Settlement Agreement (as determined in the Tribunal's Partial Award on Liability dated 4 April 2019) did not cause the Claimant not to be able to open (or re-open) a Medical School in the Cook Islands and further dismissing the Claimant's claims in their entirety.

22. On 26 February 2020, Ms Blanch wrote to the Parties to disclose she had been contacted by the International Centre for the Settlement of Investment Disputes ("**ICSID**") to accept appointment as the President of a tribunal to hear a dispute commenced by an Investor against the State of Canada under the UNCITRAL Rules, wherein one of the party appointed arbitrators was Mr James Hosking. The Parties were invited to submit their observations on this disclosure by 3 March 2020.

23. On 27 February 2020, the Respondent wrote to the Tribunal, advising it had no objections to Ms Blanch's disclosure of 26 February 2020.

24. On 1 March 2020, the Claimant wrote to the Tribunal, advising he had no objections to Ms Blanch's disclosure of 26 February 2020.

25. On 2 March 2020, the Tribunal invited the Parties to confer with respect to the timetable for filing of costs submissions and costs schedules and to present their joint views on the procedure by 9 March 2020.

26. On 9 March 2020, the Respondent wrote to the Tribunal on behalf of both Parties to inform the Tribunal that the Parties were exploring the possibility of potentially resolving the issue of costs and asking for an extension until 20 March 2020 to indicate their position.  The Tribunal granted such extension on even date.

27. On 24 March 2020, the Respondent wrote to the Tribunal on behalf of both Parties to inform the Tribunal that, as a result of the ongoing COVID-19 pandemic and the unprecedented logistical challenges that arose from it, the Parties required an extension until 10 April 2020 to conclude their discussions aimed at exploring the possibility of resolving the issue of costs.  The Tribunal granted the extension the same day.

28. On 13 April 2020, the Respondent wrote to the Tribunal noting that the costs had not been resolved by agreement and accordingly it would be filing its submissions on costs on 17 April 2020.  The Respondent further noted that the Claimant would be seeking three weeks to file its reply to the Respondent's costs submissions.

29. On even date, the Tribunal confirmed receipt of the Respondent's email and invited the Claimant to confirm that he would be filing his reply submissions by 8 May 2020.  The Claimant confirmed receipt of the Tribunal's email and the deadline for the submission of his submission on costs by an email the same day.

30. On 17 April 2020, the Respondent filed its Application for Costs ("**Application for Costs**") with the Tribunal.

31. On 30 April 2020, Seymours wrote to the Tribunal, informing that as of that date they would no longer be representing the Claimant.

32. On 6 May 2020, Mr Iorns wrote to the Tribunal stating that the Claimant had not anticipated that Seymours would cease to act for him and requesting a two-week extension to file his responsive submission on costs.

33. On 7 May 2020, the Tribunal invited the Respondent to provide its comments on the Claimant's request of 6 May 2020 for a two-week extension.

34. On 8 May 2020, the Respondent informed the Tribunal it had no objection to the Claimant's request of 6 May 2020.  On even date, the Tribunal granted the requested extension to the Claimant, noting that it was a final extension and that no further extensions would be permitted.

35. On 14 May 2020, the ICC Court extended the time limit for rendering the final award until 31 August 2020, pursuant to Article 30(2) of the ICC Rules.

36. On 20 May 2020, the Claimant wrote to the Tribunal on behalf of the Parties advising that further "*without prejudice*" discussions had taken place between the Parties and, notwithstanding that the previous extension granted had been a final extension, given the discussions between the Parties "*are showing real promise of avoiding the need to trouble the Tribunal further*" the Claimant sought, by consent, one further week's extension either to achieve a settlement or to file his reply submissions on costs.  The Respondent confirmed its agreement to this request and accordingly on even date, the Tribunal granted one final week's extension, expiring on 29 May 2020.

37. On 21 May 2020, a Mr Andrew Lear, the Claims Director from the Legal Protection Group ("**LPG**"), wrote an email to the Respondent's legal representatives and to Ms Blanch.  Mr Lear advised that LPG was the After-The-Event ("**ATE**") insurer for the Claimant and stated that, since Seymours had ceased acting for the Claimant, LPG was taking over the conduct of the costs assessment in the matter.  LPG asked the Tribunal for an extension of 21 days to submit the Claimant's submissions on costs.

38. The same day, Ms Blanch replied to LPG's email, noting that all members of the Tribunal should be in copy (and copying them while doing so) as well as indicating that the Claimant was being represented by Mr Iorns (who she also copied in the email).  The Tribunal explained that the Claimant had been given a final extension to 29 May 2020 to submit his costs submissions.

39. On 29 May 2020, the Claimant filed his Submissions on Costs ("**Submissions on Costs**") with the Tribunal.

40. On 4 June 2020, the Tribunal declared the proceedings closed pursuant to Article 27(a) of the ICC Rules.


## E.     APPLICABLE RULES AS TO COSTS

41. As is common ground between the Parties, the Tribunal's powers in relation to costs are governed by the ICC Rules of Arbitration (2017) (the "**ICC Rules**") and the Arbitration Act 1996 (the "**Arbitration Act**").  Article 38 of the ICC Rules provides in part:

> *"(4) The final award shall fix the costs of the Arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*

*(5) in making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner."*

42.  Section 59 of the Arbitration Act details what is meant by the costs of the arbitration (the "**costs of the arbitration**") and section 63 of the Arbitration Act details what is meant by the recoverable costs (the "**recoverable costs**").  These sections, together with sections 60 and 61 of the Arbitration Act, provide in relevant part as follows:

*"59. Costs of the arbitration*

*References in this Part to the costs of the arbitration are to –*

*fees and expenses,*

*the fees and expenses of any arbitral institution concerned, and*

*the legal or other costs of the parties.*

*Any such reference includes the costs of or incidental to any proceedings to determine the amount of the recoverable costs of the arbitration (see section 6).*

*60. An agreement which has the effect that a party is to pay the whole or part of the costs of the arbitration in any event is only valid if made after the dispute in question has arisen.*

*61. Award of costs.*

*(1) The tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties.*

*(2) Unless the parties otherwise agree, the tribunal shall award costs on the general principle that costs should follow the event except where it appears to the tribunal that in the circumstances this is not appropriate in relation to the whole or part of the costs.*

*……..*

*63. The recoverable costs of the arbitration.*

*(1) The parties are free to agree what costs of the arbitration are recoverable.*

*(2) If or to the extent there is no such agreement, the following provisions apply.*

*(3) The tribunal may determine by award the recoverable costs of the arbitration on such basis as it thinks fit.  If it does so, it shall specify-*

*(a) the basis on which it has acted, and*

*(b) the items of recoverable costs and the amount referable to each.*

*…*

*(5) Unless the tribunal or the court determines otherwise-*

*(a) the recoverable costs of the arbitration shall be determined on the basis that there shall be allowed a reasonable amount in respect of all costs reasonably incurred, and*

*(b) any doubt as to whether costs were reasonably incurred or were reasonable in amount shall be resolved in favour of the paying party.*

*(6) …"*

## F.    CONTRACTUAL PROVISION AS TO COSTS

43.    Paragraph 14 of the Settlement Agreement provides in relevant part:

"….*In the event of any subsequent litigation, if any, concerning any of the Released Claims or the subject matter of the Action, or between the Parties to enforce this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and litigation costs with respect to such subsequent litigation.*"

## G.    OVERVIEW OF THE RESPONDENT'S POSITION

44.    Noting that the Tribunal has a broad discretion to award costs (referring to section 61(1) of the Arbitration Act and Article 38 of the ICC Rules) the Respondent seeks recovery of its costs on a full indemnity basis or, in the first alternative, its costs from 1 December 2018 or, in the second alternative, its costs incurred in the Causation Phase.

45.    The Respondent says it completely prevailed in its defence of the Claimant's claims and further asserts the Claimant did not conduct the Arbitration in a cost-effective manner.

46.    With respect to its first contention that it completely prevailed in its defence, the Respondent notes that all eight causes of action contained in the Claimant's Statement of Case were dismissed with no damages being awarded to the Claimant.  Given that the Claimant was seeking damages of USD 20 million but was awarded nothing, the Respondent says that "*on any metric*" it has

completely prevailed in its defence.  It is irrelevant that one of the Claimant's
causes of action was not dismissed until the second phase, the Causation Phase,
because: (i) the Tribunal determined the technical breaches of the Settlement
Agreement were significantly outnumbered by a number of the Claimant's other
complaints; and (ii) the Tribunal dismissed the Claimant's "*primary case*" (that the
external accreditation requirement was illegal and a breach of the Settlement
Agreement) in its Partial Award on Liability.

47.   The Respondent next refers to three examples of the Claimant's failure to
conduct the arbitration on a cost-effective manner.  Firstly, the Claimant rejected
a "*Without Prejudice Save As To Costs*" settlement offer on 28 November 2018
(before the Liability Hearing) which would have resulted in the Parties each
bearing their own costs incurred to date and sharing the costs of the arbitration
on a 50:50 basis (the "**Settlement Offer**").  The Respondent notes it made clear
to the Claimant in this offer that if he did not accept this offer, the Respondent
would seek an order for its costs on an indemnity basis.[4]  The Settlement Offer
expired on 30 November 2018.

48.   The Respondent next notes that the Claimant sought to adduce five new witness
statements for the Causation Hearing, including testimony from an entirely new
and additional expert, even though in directing this further bifurcated hearing,
the Tribunal had stated that most of the evidence on causation was already
before them.  The Respondent had objected to this at the time and had noted its
concern as to the increased costs which would result.

49.   The Respondent then says that the Claimant gave contradictory evidence during
the proceedings.  In the Liability Hearing, the Claimant testified that when he
submitted his application to operate a medical school, he had understood that
the Respondent required proof of external accreditation and that even if he had
been informed of this requirement he would not have attempted to comply with
it.  However, in the Causation Hearing, the Claimant's case was that he could and
would have sought accreditation for his medical school in New Zealand.  This
"*flatly contradicted*" the Claimant's prior evidence, leading the Tribunal to find in
its Partial Award on Causation that "*it is impossible to avoid the conclusion that
Dr Hubbart's evidence now as to what he would have done but for the breaches
of contract is inspired by the need to find a case on causation that fits the
breach*."[5]  The Respondent further refers to the Tribunal's findings in the Partial
Award on Liability that the Claimant's evidence in support of his case to the
effect that he could have submitted a credible application to operate the first
private medical school in New Zealand was "*wholly vague*", "*wholly colourless*"
and "*inconsistent*"[6] and even the Claimant's expert had been unable to identify
any specific advice she would have given "*due to the lack of instructions and
supporting application material*" provided by the Claimant.  Accordingly, the

---

[4] Annex B to the Application for Costs.
[5] Para 97.
[6] Para 99.

Claimant's insistence on submitting a meritless case on causation justifies an
award of indemnity costs to the Respondent.

50.   In the alternative, the Respondent notes that its aggregate costs after the
      Settlement Offer expired (namely as from 1 December 2018) total USD
      763,179.26, and that costs of USD 222,037.27 were incurred in connection with the
      Causation Phase of the proceedings.  Should the Tribunal not award the Respondent
      its full costs, the Respondent claims that it should be awarded its costs from
      1 December 2018 or, at a minimum, the costs in connection to the Causation Phase.

51.   The Respondent confirms it has paid all costs it is seeking to recover.  It says legal
      costs of USD 923,925.00 to defend against eight causes of action are reasonable
      as are the costs of its experts, Mr Sherwin and Mr Weston.  The Respondent
      further says that its disbursements are reasonable given that it had to participate
      in two oral hearings at the Claimant's insistence.  The Respondent therefore
      seeks an award in its favour ordering the Claimant to pay the Respondent's costs
      in the amount of USD 1,310,097.73 (subject to adjustment for the final ICC Costs)
      as summarised below.

52.   In relation to interest on the costs, the Respondent seeks an order for post-
      Award interest at a rate of 8% per annum, making reference to s.49(4) of the
      Arbitration Act which provides in relevant part that "*The tribunal may award
      simple or compound interest from the date of the award (or any later date) until
      payment, at such rates and with such rests as it considers meets the justice of the
      case, on the outstanding amount of any award*'" and to section 17 of the
      Judgments Act 1838 (the "**Judgments Act**") which provides that the judgments
      rate of interest is 8%.

53.   The Respondent provided the following breakdown of costs in Annex A to its
      Application for Costs:

|  | Liability Phase Costs | Causation Phase Costs | Total Costs Incurred |
|---|---|---|---|
| **1. Arbitration Costs Paid to the ICC** | | | |
| *Item* | | *Amount (USD)* | |
| ICC Costs to Date | | | $237,500.00 |
| **Total ICC Costs to Date** | | | **$237,500.00** |
| | | | |
| **2. Legal Fees** | | | |
| *Item* | | | |
| Chaffetz Lindsey Fees | $733,787.50 | $190,137.50 | $923,925.00 |
| **Total Legal Costs** | | | **$923,925.00** |
| | | | |
| **3. Expert Costs** | | | |
| *Item* | | | |
| Peter Sherwin | $30,482.27 | $7,745.46 | $38,227.73 |
| Tom Weston QC | $28,721.28 | $4,207.46 | $32,928.74 |

| | | | |
|---|---|---|---|
| **Total Expert Costs** | | | **$71,156.47** |

**4. Hearing-Related Costs**
*Item*

| Item | | | |
|---|---|---|---|
| Accomodation | $15,596.35 | $7,154.95 | $22,751.30 |
| Travel | $6,763.60 | $8,499.86 | $15,263.46 |
| 50% Hearing Room | $3,195.00 | $1,103.17 | $4,298.17 |
| 50% Hearing Food | $796.29 | $218.60 | $1,014.89 |
| Incidentals | $2,394.73 | $752.29 | $3,147.02 |
| Hearing Printing | $76.64 | | $76.64 |
| 50% Court Reporter & Transcripts | $3,224.61 | $952.03 | $4,176.64 |
| Chaffetz Lindsey Witness Bundles | $4,151.84 | | $4,151.84 |
| Shipping and Supplies | $3,797.32 | | $3,797.32 |
| Demonstrative Support & Vendors | $9,662.50 | | $9,662.50 |
| 50% Videoconference Hire | | $352.00 | $352.00 |
| **Total Hearing-Related Costs** | | | **$68,691.78** |

**5. Other Costs**
*Item*

| Item | | | |
|---|---|---|---|
| English/NZ law advice (Essex Court Chambers) | $7,232.76 | $0.00 | $7,232.76 |
| Vendor Support for Memorials | $677.77 | $913.95 | $1,591.72 |
| **Total Other Costs** | | | **$8,824.48** |

| | | | |
|---|---|---|---|
| **Cook Islands Total Costs** | | | **$1,310,097.73** |

## H.    OVERVIEW OF THE CLAIMANT'S POSITION

54.    The Claimant accepts the legal analysis presented by the Respondent in support of its application for an order for costs but disputes that it is appropriate in this case to award costs on an indemnity basis.

55.    In opposing the Respondent's Application for Costs, the Claimant makes two arguments: (i) the Respondent's conduct of the dispute increased costs; and (ii) the Respondent's costs are unreasonable.

56.    The Claimant first says that the Settlement Offer should be read in the context of a series of communications between the Parties which the Claimant annexes to his Submissions on Costs.  The Claimant says he made genuine efforts to settle the case but his efforts were rebuffed by the Respondent's drop hands settlement which, he notes, was only valid for two days and which, he asserts, "*was not a genuine attempt at settlement on the part of Respondent, but a strategic decision to leverage in an eventual application for full indemnity costs. It would be wrong in law to enable a party to rely on such a transparent attempt to set up an eventual claim for indemnity costs. Even had there been a meaningful attempt at settlement by Respondent, indemnity costs would not necessarily follow*".

57.   The Claimant next says that whilst the Respondent was ultimately successful, it conducted its defence in a manner which greatly increased the cost of the dispute.  The Claimant contends that the Respondent sought to focus exclusively on the application of the Cook Islands Education Act whereas he was concerned with the Respondent's obligations under the Settlement Agreement which the Respondent was found to have breached.  Had the Respondent conceded liability at the beginning of the dispute and only contested causation, the Claimant says costs would have been saved.

58.   Moreover, the Claimant argued that over half of the Respondent's claimed legal fees relate to the Liability Phase, which, according to the Claimant, ultimately proved the Respondent had breached the Settlement Agreement (as held in the Partial Award on Liability).  The Claimant argued that had the Respondent identified causation as an issue from the outset and conceded Claimant's claim regarding the breach of the Settlement Agreement, the proceedings may have been significantly less costly.

59.   The Claimant concludes by saying that the legal fees incurred by the Respondent during the Liability Phase were not reasonable but he does not provide any substantive explanation as to why he contends they are unreasonable.  He further says that he is unable to comment on the reasonableness of the fees incurred by the Respondent in the Causation Phase without a detailed breakdown.

60.   The Claimant therefore seeks an order that the Respondent be awarded:

   a.   Reasonable legal fees for the Causation Phase; and

   b.   Reasonable expenses.

I.   **THE TRIBUNAL'S DETERMINATION**

61.   The Parties are agreed on the broad principles governing the allocation of costs in this case.[7]  In accordance with Article 38(4) of the ICC Rules: "*The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*"  Article 38(5) provides: "*In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.*"  In addition, the Settlement Agreement provides that "*the prevailing party shall be entitled to recover its reasonable attorneys' fees and litigation costs*".

---

[7] Para 1 of the Claimant's Submissions on Costs confirms his agreement to the Respondent's legal analysis.

Finally, there are no mandatory rules of the law of the seat of the arbitration (London) that would override the principles set out in Article 38 of the ICC Rules.

62. We therefore first turn to consider whether the Respondent prevailed in this arbitration as it contends it did.

### I.    Did the Respondent prevail?

63. The Respondent says that as all eight of the Claimant's claims were dismissed and no monetary damages were awarded to the Claimant, it clearly prevailed in this arbitration, whereas the Claimant says that as he won the Liability Phase, it cannot be argued that the Respondent prevailed in the arbitration.

64. Whilst we agree that the Claimant was successful in his argument that the Respondent did breach its obligations under the Settlement Agreement, we do not agree that of itself this means the Respondent did not prevail in this arbitration.  To state the obvious the Claimant has made no recovery.  The breach which was established was found on the causation phase to be wholly technical in the sense it had no causative effect.  Moreover, as a consequence of the issues determined in the Liability Hearing, the ambit of the Causation Hearing was considerably reduced such that we were able to conclude the Causation Hearing in one day.  Had there not been a separate Liability Hearing, the Causation Hearing would have had to hear evidence with respect to each of the individual claims brought by the Claimant, an exercise which could not have been concluded within one day and would likely have required a hearing of several days duration with significantly more witness and expert evidence to hear.  We therefore find that having successfully defended each of the claims brought against it by the Claimant, the Respondent has prevailed in this arbitration, entitling the Respondent to be awarded its costs in respect of the "*fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court*" as well as its legal costs and other costs, the latter being subject to any adjustments for reasonableness, to which the Tribunal now turns.

### II.    Reasonability of the Respondent's Costs

65. Article 38(1) of the ICC Rules states that the costs of the arbitration include "*reasonable legal and other costs incurred by the parties for the arbitration*".  The Claimant makes two arguments as to why the Respondent's costs are unreasonable: (i) the Respondent's conduct of the case led to increased costs; and (ii) the quantum of its fees are unreasonable.

*The Respondent's Conduct of the Case – October/November 2018*

66. The Claimant says he made genuine efforts to settle the case prior to the Causation Hearing whereas the Respondent's drop hands settlement was purely

strategic, with a view to supporting its claim for indemnity costs.  Both Parties have referred to these settlement negotiations and the offers themselves were attached to the Parties' respective costs submissions.  We therefore turn to consider the Parties' respective conduct.  In summarising the communications exchanged between the Parties, we note they were all headed "*Without Prejudice Save As To Costs*".

67.   On 12 October 2018 the Claimant wrote to the Respondent noting that he appreciated the Respondent would be preparing its reply submissions but proposing that the Parties enter into settlement negotiations and offering mediation, whilst accepting that it may be logistically difficult to undertake a mediation at that late stage.

68.   On 18 October 2018, the Respondent replied noting that (i) it was not the party which had commenced proceedings; (ii) it had always been willing to engage in good faith settlement negotiations; (iii) no monetary or other offer had been put forward; and (iv) advising that given the upcoming filing deadlines, a mediation would not be logistically possible.  The Respondent further noted that it had a public duty to seek recovery of its costs on an indemnity basis.

69.   On 24 October 2018, the Claimant wrote to the Respondent offering to accept a payment, either one off or in instalments, of USD 14,500,000.00 together with an update to the third-party communications, retracting what the Claimant termed "*Catherine Evans' false communications*" in full and final settlement of his claim.  The Claimant further offered that costs would lie as they fell and he would be prepared to agree not to seek to operate any business within the Cook Islands for the next ten years.  The Claimant requested a response to this offer within seven days.

70.   On 28 November 2020, the Respondent replied to the Claimant's offer.  The Respondent reminded the Claimant that it had had to focus over the previous weeks in preparing and filing its Reply Memorial (filed on 19 November 2018).  The Respondent then remarked that the Claimant's view of the strength of his case was "*divorced from legal and factual reality*" and noted that the offer "*simply confirms Respondent's understanding that* [the Claimant's] *repeated litigations have been nothing more than an ill-conceived "shake down" of the Cook Islands, belying* [the Claimant's] *claim that he "has no wish to bankrupt a nation of which he remains fond."* "  The Respondent rejected the Claimant's settlement offer, instead making a counter offer in the following terms: "*Respondent is willing to agree to a full and final settlement by which (1) Claimant withdraws all claims with prejudice, (2) the "costs of arbitration," as determined by the ICC for purposes of Article 38 of the ICC Rules will be split 50:50 between Claimant and Respondent, and (3) each party bears its own costs other than the "costs of arbitration.*"  The Respondent sought a response to this offer by 30 November 2020 "*given the proximity of the hearing*".  The Respondent further advised that: "*In the absence of acceptance of the above*

*offer, as has already been noticed, Respondent intends to seek recovery from the Tribunal of all of its costs, including attorney's fees and expert fees, on a full indemnity basis. In the meantime, Respondent has no choice but to continue to prepare for the London liability hearing and to incur all reasonable costs associated therewith.*"

71.   In considering the Claimant's contention as to the lack of reasonableness on the part of the Respondent in rejecting his offer, we first note that the Claimant's proposal to enter into settlement negotiations was made on 12 October 2018, being ten days after the Claimant had filed his Reply Memorial on Liability and just over a month before the Respondent was to file its Reply Memorial on Liability (on 19 November 2018).  The Claimant's quantified settlement offer was sent on 24 October 2018 and was specified to be for USD 14,500,000, a 27.5% discount from the total amount claimed of USD 20,000,000.  In the Tribunal's view, at this stage of the proceedings (before the Liability Hearing), it was not unreasonable for the Respondent to have rejected this offer.  Our view is supported by the fact that the Respondent successfully defended all of the claims brought against it by the Claimant.  We see no evidence of any strategic manoeuvring by the Respondent to position itself in order to support any claim for indemnity costs.  Indeed, albeit with the benefit of hindsight, the Respondent's decision to reject the Claimant's offer was clearly sound.

72.   We therefore do not find that there was any unreasonable conduct by the Respondent in the way it responded to the Claimant's attempt to settle his claim in October and November 2018.

*The Respondent's conduct of its Defence – the Liability Phase*

73.   The Claimant next says that had the Respondent conceded liability at the beginning of the dispute, contesting only causation, costs would have been saved.  In this regard, the Claimant notes that over half of the Respondent's claimed legal fees relate to the Liability Phase which the Respondent lost.  Given our determination above that as a result of our findings in the Liability Award, there was a significant reduction in issues to be determined in the Causation Phase leading to a consequent reduction in both the Parties' respective legal costs and Tribunal costs for the Causation Phases,[8]  we do not find that the Respondent's conduct of its Defence in the Liability Phase was unreasonable.  In particular, we do not find that the Respondent's conduct led to an increase in its legal costs, rather it led to a decrease.  It follows therefore that those costs which are awarded to the Respondent should relate to all the work undertaken by the Respondent from the date on which the proceedings were commenced and not be limited solely to the costs of the Causation Phase.

---

[8] See para 64 above

74.     We next turn to the Claimant's second argument, namely that the quantum of the Respondent's fees are unreasonable.

*The quantum of the Respondent's fees*

75.     The first indicator as to the reasonableness or otherwise of the Respondent's legal costs and expenses would typically be a comparison with the Claimant's own legal costs and expenses.  Given these have not been provided to us, we are unable to undertake this comparison.

76.     The Claimant did not contend that the Respondent's fees were not properly incurred.  We have seen no evidence to suggest they were not properly incurred and given the work undertaken by the Respondent's counsel team, we have no hesitation in finding that these costs were properly incurred.  The Claimant does contend that the Respondent's legal fees during the Liability Phase were not reasonable, but this contention was not supported by any reasoning whatsoever.  The Claimant says that he is unable to comment on the reasonableness of the fees incurred by the Respondent in the Causation Phase without a detailed breakdown.  However, the level of detail provided by the Respondent is of the level that is customarily provided in international arbitrations.  Given our finding that the work undertaken by the Respondent in the Liability Phase reduced the costs of the Causation Phase, we cannot agree with the Claimant.  Having reviewed the Respondent's cost schedule, we do not find that there is anything which appears to us to be unreasonable, either with respect to the legal fees or the disbursements incurred by the Respondent.  We are however mindful that the Claimant was successful in proving that the Respondent did act in breach of the Settlement Agreement and whilst we did not find this caused any loss to the Claimant, in the exercise of our discretion, we have resolved to apply a discount of 10% to the Respondent's total legal fees.

77.     We therefore determine that the Claimant shall pay the Respondent's legal costs in the amount of USD 980,205.23 comprising (i) legal fees of USD 831,532.50 (being USD 923,925.00 minus the 10% reduction of USD 92,392.50) and (ii) all other costs incurred in the arbitration being USD 148,672.73 comprising:

   a.     Experts' costs: USD 71,156.47

   b.     Hearing related costs: USD 68,691.78

   c.     Other costs: USD 8,824.48

78.     We further determine that the Claimant shall reimburse the Respondent for its share of the ICC's Administrative Expenses and the Tribunal's Fees and Expenses which were fixed in the amount of USD 475,000 by the ICC Court on 25 June 2020.  The advance on costs was fixed by the Court at USD 475,000 and was paid

by the Parties in equal shares.  Accordingly, the Claimant is to reimburse the Respondent USD 237,500 representing the Respondent's share of the ICC's Administrative Costs and the Tribunal's Fees and Expenses.

79.   The total costs awarded to the Respondent are therefore legal costs of USD 980,205.23 and its share of the ICC's Administrative Costs and the Tribunal's Fees and Expenses being USD 237,500.

80.   We now turn to the Respondent's claim for post award interest on its costs.

**J.      INTEREST**

81.   The Respondent seeks an order for post-Award interest at a rate of 8% per annum pursuant to section 49 of the Arbitration Act and to section 17 of the Judgments Act which provides for an interest rate of 8%.  The Claimant made no submissions in relation to post award interest and in the circumstances of this case we find that an interest rate of 8% is reasonable.  Accordingly, pursuant to our discretion under section 49(4) of the Arbitration Act and pursuant to section 17 of the Judgments Act, we order that simple interest of 8% will accrue on the costs awarded to the Respondent from the date of this Final Award on Costs until the date of payment.

**K.      DISPOSITIVE**

82.   For the reasons set out above, the Tribunal, having heard all the evidence and submissions of the Parties, hereby AWARDS, ADJUDGES and DECLARES that:

   a.   The Claimant shall pay to the Respondent the amount of USD 237,500 as reimbursement of the Respondent's share of the ICC's Administrative Costs and the Tribunal's Fees and Expenses;

   b.   The Claimant shall pay to the Respondent the amount of USD 980,205.23 in respect of the Respondent's legal costs and other costs incurred in this arbitration; and

   c.   The Claimant shall pay simple interest on all sums due to the Respondent pursuant to paragraph 82(a) and 82 (b) of this Award at the rate of 8% per annum from the date of this Award until the date of actual payment; and

   d.   All other claims are dismissed.

**ICC Arbitration – 23261/TO/AZR**
Final Award on Costs

Place of Arbitration:     London, United Kingdom

Date:          01 July 2020

Signatures:


**Mr William Wood QC**
Co-Arbitrator


**Mr Murray Rosen QC**
Co-Arbitrator


**Juliet Blanch**
Presiding Arbitrator